PHILLIP MORRIS INCORPORATED;
R.J. Reynolds Tobacco Company;
Brown & Williamson; Tobacco Cor-
poration; and Lorillard Tobacco Com-
pany, Plaintiffs

v.

Thomas F. REILLY, Attorney General
of the Commonwealth of Massachu-
setts, and Howard K. Koh, Massachu-
setts Commissioner of Public Health,
Defendants.

United States Tobacco Company;
Brown and Williamson Tobacco Cor-
poration; Conwood Company, L.P.;
National Tobacco Company, L.P.; the
Pinkerton Tobacco Company; and
Swisher International, Inc., Plaintiffs

v.

Thomas F. Reilly, Attorney General of
the Commonwealth of Massachusetts,
and Howard K. Koh, Massachusetts
Commissioner of Public Health, De-
fendants.

Nos. CIV.A.96–11599–GAO,
CIV.A.96–11619–GAO.

United States District Court,
D. Massachusetts.

Sept. 7, 2000.

Thomas J. Griffin, Jr., Goodwin, Procter & Hoar, Boston, MA, John B. Connarton, Jr., Connarton, Wood & Callahan, Boston, MA, Carol Lynn Bear, Connarton, Wood & Callahan, Boston, MA, for Phillip Morris Inc.

John H. Henn, Foley, Hoag & Eliot, Boston, MA, John B. Connarton, Jr., Connarton, Wood & Callahan, Boston, MA, Carol Lynn Bear, Connarton, Wood & Callahan, Boston, MA, for R. J. Reyunolds Tobacco Co, Brown & Williamson Tobacco Corp.

Thomas A. Barnico, Rebecca P. McIntyre, Rosalyn Garbose, Attorney General's Office, Boston, MA, for L. Scott Harshbarger, David H. Mulligan.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiffs in these companion cases are manufacturers of cigarettes and smokeless tobacco products. They filed these suits seeking declaratory and injunctive relief prohibiting the defendants from enforcing certain provisions of Mass. Gen. Laws ch. 94, § 307B (the "Disclosure Act").[1] The plaintiffs contend that en-

---

1. The Disclosure Act provides as follows:

For the purpose of protecting the public health, any manufacturer of cigarettes, snuff or chewing tobacco sold in the commonwealth shall provide the department of public health with an annual report, in a form and at a time specified by that department, which lists for each brand of such product sold the following information:

(a) The identity of any added constituent other than tobacco, water or reconstituted tobacco sheet made wholly from tobacco, to be listed in descending order according to weight, measure, or numerical count; and

(b) The nicotine yield ratings, which shall accurately predict nicotine intake for average consumers, based on standards to be established by the department of public health.

The nicotine yield ratings so provided, and any other such information in the annual reports with respect to which the department determines that there is a reasonable scientific basis for concluding that the availability of such information *could* reduce risks to public health, *shall be public records;* provided, however, that before any public disclosure of such information the department shall request the advice of the attorney general whether such disclosure would constitute an unconstitutional taking of property, and shall not disclose such information unless and until the attorney

forcement of the Act would violate rights guaranteed them under the United States Constitution in three ways: (1) it would effect an uncompensated taking of property by the State in violation of the Fifth and Fourteenth Amendments, (2) it would deprive them of valuable property without procedural due process in violation of the Fourteenth Amendment, and (3) it would constitute an improper encroachment by the Commonwealth into the domain of interstate commercial regulation which the Commerce Clause reserves to the national government.

Earlier in the case, this Court granted partial summary judgment in favor of the defendants on the plaintiffs' claim that the Disclosure Act was preempted by the Federal Cigarette Labeling and Advertising Act ("Labeling Act"),15 U.S.C. § 1331 *et seq.*, or the Comprehensive Smokeless Tobacco Health Education Act of 1986 ("Smokeless Tobacco Act"), 15 U.S.C. §§ 4401–08. The Court also granted a preliminary injunction restraining the Commonwealth from enforcing the statute pending a full adjudication of the remaining claims. After interlocutory appeals, those rulings were affirmed. *See Philip Morris, Inc. v. Harshbarger,* 122 F.3d 58 (1st Cir.1997); *Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670 (1st Cir.1998).

The Court now addresses the parties' cross-motions for summary judgment. For the reasons that follow, the plaintiffs' motions are GRANTED, and defendants are permanently enjoined from enforcing so much of the Disclosure Act as requires manufacturers of cigarettes, snuff or chewing tobacco to disclose brand-specific infor-

mation identifying constituent ingredients of their products.[2]

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Simply alleging that a factual dispute exists will not defeat the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The dispute must be "genuine," which means that sufficient evidence must exist to permit a reasonable trier of fact to resolve the issue in the nonmovant's favor; the evidence must go beyond raising a colorable question of fact and show that differing versions of the facts exist. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668, 684 (1st Cir.1994) (citing *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989)).

The plaintiffs contend that the statute is unconstitutional on its face. Striking down a law on its face results in the wholesale invalidation of the law in all of its possible applications, and thus it is "strong medicine" that should only be prescribed as a last resort against constitutional infirmity. *See National Endowment for the Arts v. Finley,* 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). The Supreme Court has said that a statute may only be invalidated on its face if one can fathom no set of circum-

---

general advises that such disclosure would not constitute an unconstitutional taking.

This section shall not require a manufacturer, in its report to the department or otherwise, to identify or disclose the specific amount of any ingredient that has been approved by the Food and Drug Administration, Public Health Service, United States Department of Health and Human Services ("FDA"), or its successor agency, as safe when burned and inhaled or that

has been designated by the FDA, or its successor agency, as generally recognized as safe when burned and inhaled, according to the Generally Recognized as Safe list of the FDA.

Mass. Gen. Laws ch. 94, § 307B (emphasis added).

2. The constitutionality of the Disclosure Act's nicotine disclosure requirements is not in issue.

stances under which the law could be constitutionally applied. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).[3]

When evaluating a facial challenge to a state statute, a federal court does not confine itself strictly to its own interpretation of the statute's language; it must also "consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). And the Court assumes, as it must, that the state agencies charged with the execution of the statute will carry out its terms in good faith. *See Sullivan v. Everhart*, 494 U.S. 83, 94, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990).

## UNDISPUTED FACTS

The plaintiffs in these related cases manufacture cigarettes (96–11599–GAO) and smokeless tobacco products (96–11619–GAO). Their products are manufactured outside the Commonwealth and sold nationwide. Each plaintiff adds ingredients other than tobacco, water, or reconstituted tobacco sheet to brands sold in Massachusetts and elsewhere.

Federal law requires the plaintiffs to disclose, once a year, a list of the ingredients added to the tobacco products that they manufacture. The list need not identify particular companies, brands, or the absolute or relative quantities of ingredients. The plaintiffs have made all of the required disclosures, but have carefully avoided linking the ingredients to particular companies or brands in those disclosures.[4] The Commonwealth's Department of Public Health (the "DPH") has a copy of the plaintiffs' 1993 list.[5]

These added ingredients produce distinctive flavors, tastes, and aromas which vary from brand to brand and are a reason why consumers choose one brand over another.[6] The ingredients, therefore, are considered important to competitive success.[7] The plaintiffs have spent millions of dollars developing the ingredient formulas used in specific cigarette brands, and those brands are themselves valued by the plaintiffs at billions of dollars in the aggregate.[8] Brand-specific ingredient information for smokeless tobacco products is also extremely valuable.[9]

Each plaintiff keeps secret the recipe of ingredients for its brands. For each plaintiff, the identity of the specific ingredients in a given product, and the relative quantities in which the ingredients are used, are kept secret from the public, from other

---

**3.** Subsequent decisions have qualified somewhat the rigidity of *Salerno*'s rule. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (striking down antiabortion law on its face where it would present a substantial obstacle to exercise constitutional rights in a "large fraction" of cases); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue*, 505 U.S. 71, 71, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992) (state law taxing dividends of foreign subsidiaries but not dividends of domestic subsidiaries facially violated Commerce Clause despite possibility of nondiscriminatory application). Some Justices have asserted that the "no circumstances" standard had never been the basis of any of the Court's decisions. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (opinion by Stevens, J., joined by Souter and Ginsburg, JJ.).

**4.** Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶ 24; *see id.*, 96–11619–GAO, ¶ 20.

**5.** Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶ 28; *see id.*, 96–11619–GAO, ¶ 22.

**6.** Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶¶ 8–10; *see id.*, 96–11619–GAO, ¶ 9.

**7.** Pls.' Statement Undisputed Facts, 96–11599–GAO, ¶ 10; *see id.*, 96–11619–GAO, ¶ 11.

**8.** Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶¶ 11, 13.

**9.** Pls.' Statement of Undisputed Facts, 96–11619–GAO, ¶¶ 12, 13.

plaintiffs, and from the plaintiffs' other competitors.[10] Even within the plaintiff companies, information regarding ingredient recipes is purposely compartmentalized. While many employees may each know a bit of a recipe, very few persons have access to any particular recipe in its entirety.[11] To date, the plaintiffs have successfully maintained the secrecy of their ingredient recipes,[12] even though the plaintiffs and their competitors are always alert to discovering competitors' recipes. Several plaintiffs have made attempts in the past to discover the ingredients used in other plaintiffs' brands, but these attempts have been unsuccessful.[13] Although "reverse-engineering" may permit identification of what chemicals are present in a particular product, knowing the chemical composition of a brand apparently does not by itself disclose the ingredients, or the relative amounts of them, that were used to make the product.[14] A list that disclosed what specific ingredients are used in an identified brand, arranged in descending order according to the relative amounts of each ingredient used, would aid a competitor's efforts to duplicate that brand, even if the list did not tell exactly how much of each ingredient was used.[15]

The Disclosure Act would require the plaintiffs to provide the DPH with a list of the ingredients used in any tobacco products sold within the Commonwealth. The list for each brand would identify the ingredients used in that brand ranked "in descending order according to weight, measure, or numerical count." In addition to the ingredient list, each brand's "nicotine yield rating," which is the estimated amount of nicotine an average consumer would ingest by using the product, must also be revealed. See Mass. Gen. Laws ch. 94, § 307B. Both the ingredient list and nicotine yield rating for each brand "shall" become public record, in full or redacted form, if two conditions are met. First, the DPH must determine that "there is a reasonable scientific basis for concluding that the availability of such information could reduce risks to public health." Second, the Attorney General of the Commonwealth must advise the DPH that the public release of the information would not cause an unconstitutional taking of property. See id.; Mass. Regs.Code tit. 105, § 660 et seq. (the "implementing regulations").

The defendants contend that some of the facts described above are the subject of genuine dispute, but they do little more than raise the sort of "metaphysical doubt" about those facts which are not enough to create a genuine factual dispute. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The defendants' first major objection concerns the plaintiffs' evidence that the ingredients used in their tobacco products give each brand a distinctive flavor, taste and aroma, and that consumers choose brands based on these characteristics. The defendants assert that consumers use tobacco products pri-

10. Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶ 15; see id., 96–11619–GAO, ¶ 10.

11. Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶ 14.

12. Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶¶ 19–20; see id., 96–11619–GAO, ¶¶ 10, 17; Defs.' App. of Exs., Vol. III, Ex. 3, 96–11599–GAO (excerpt from Brown & Williamson Routine Domestic Competitive Monitoring Report); Norman Dep., 96–11599–GAO, pp. 46–47. See also Pls.' Statement. of Undisputed Facts., 96–11599–GAO, ¶ 14; see id., 96–11619–GAO, ¶ 15 (describing comprehensive security measures and precautions taken to maintain confidentiality of product ingredient information).

13. See Gonterman Dep., 96–11599–GAO, pp. 58, 68, 119, 124, 125; Lawrence Dep., 96–11599–GAO, pp. 67–79, 117; Pls.' Statement of Undisputed Facts, 96–11619–GAO, ¶ 16.

14. See Manning Dep., 96–11599–GAO, pp. 86–87, 93 ("[I]t is not possible for us to identify ingredients, only constituents of products.").

15. See Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶ 23.

marily to ingest nicotine.[16] The evidence defendants cite certainly supports the fact that consumers. of tobacco products crave nicotine, but it does not contradict the plaintiffs' evidence on brand selection. The plaintiffs have claimed that flavor, taste and aroma are important factors— not the only factors—that influence consumers' choice among brands. For example, a person may smoke to consume nicotine, but that does not necessarily explain why that consumer might choose Newport Menthols over Marlboro Lights. · Since all tobacco products contain nicotine, the competitive advantage arising from producing a brand having a taste or aroma pleasing to consumers is obvious, even if, as the defendants contend, most consumers smoke or chew tobacco primarily to consume nicotine.

The defendants also contest whether plaintiffs have managed to keep their brand-specific product ingredient information secret, citing internal tobacco company documents and deposition testimony which indicate that some additives and chemical constituents present in particular tobacco brands have been identified.[17] The documents and deposition testimony do indicate that· some brand-specific ingredient information is generally known, and thus certain tobacco product ingredients cannot be considered to be secret. But this evidence does not undermine the fact that most of the plaintiffs' brand-specific ingredient formulae remain secret. In fact, each document cited by the defendants and ·much of the deposition testimony underscore how the plaintiffs' efforts to discover the ingredients used in their competitors' brands have failed. That a few pieces of the information have been discovered does not disturb the material fact

that each plaintiff's ingredient recipes remain secret overall.

Therefore, the Court concludes that there is no genuine dispute as to the facts described above. The question next arises whether, on the undisputed facts, one party or the other is entitled to judgment as a matter of law. All reasonable inferences from the record must be drawn in the light most favorable to the motion's opponent. *See Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 986 (1st Cir.1995).

## ANALYSIS

### I. *The Plaintiffs' Property Interests in Trade Secrets*

 A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Restatement (First) of Torts* § 757 cmt. b (1939). Trade secrets are recognized as property interests in Massachusetts.[18] *See General Chem. Corp. v. Department of Envtl. Quality Eng'g*, 19 Mass.App.Ct. 287, 474 N.E.2d 183, 185–86, *review denied*, 394 Mass. 1103, 477 N.E.2d 595 (1985). In order to qualify as a trade secret, the information must be confidential and valuable to the party seeking to protect it. *See Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 282 N.E.2d 921, 925 (1972). Under the *Restatement* and Massachusetts law, there are six factors to be considered in determining whether these conditions of value and confidentiality are met: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others in the business; (3) the measures taken by the

---

16. Defs.' Response to Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶¶ 9–10; *see id.* 96–11619–GAO, ¶ 11.

17. Defs.' Response to Pls.' Statement of Undisputed Facts, 96–11599–GAO, ¶¶ 15, 18–23; *see id.*, 96–11619–GAO, ¶¶ 10, 14, 16–18.

18. The parties have not disputed the application of Massachusetts law to this issue. Furthermore, the law of each plaintiff's place of incorporation or principal place of business concerning trade secrets follows either the *Restatement* or the Uniform Trade Secrets Act, 14 U.L.A. 437 *et seq.* (1990), and is, in respects relevant to this case, the same as that of Massachusetts.

party to preserve the information's secrecy; (4) the value of the information to the party and its competitors; (5) the resources used by the party to obtain or develop the information; and (6) the relative difficulty (or ease) with which another could legally develop or discover the information independently. *See Restatement (First) of Torts* § 757 cmt. b; *Jet Spray*, 282 N.E.2d at 925.[19]

The undisputed record evidence shows that ingredient information for specific products is kept confidential by each plaintiff. Within the plaintiff companies, knowledge of the ingredient formulas is strictly controlled and is accessible to only a select few employees, who are given access to the ingredient recipes on a compartmentalized, "need to know" basis. Given that one need only take "proper and reasonable steps" to protect against the disclosure of information claimed to be a trade secret, *see J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 260 N.E.2d 723, 730 (1970), the plaintiffs have established that they treat the specific ingredient information as confidential.

As noted, the defendants argue that the information the plaintiffs seek to protect is no longer truly confidential. In support, they cite a written statement by R.J. Reynolds that accompanied the public release of its aggregate cigarette ingredient information, as well as deposition testimony by representatives of various plaintiffs. These sources show that sugars, glycerin, propylene glycol, cocoa and licorice are known to be common ingredients in cigarettes and that licorice and sugars are common in smokeless tobacco products.[20]

 Plainly, information held out for public view cannot be protected as a trade secret. *See, e.g., Jillian's Billiard Club of Am., Inc. v. Beloff Billiards, Inc.*, 35 Mass. App.Ct. 372, 619 N.E.2d 635, 638 (1993) (types of billiard tables, cues, parking, and decor were not trade secrets because that information was readily obtained by reading advertising and visiting billiard parlor). It is also true that knowledge of one or more of the ingredients actually used in a competitor's brand would to some extent assist a reverse-engineer in creating a copycat product.[21] The R.J. Reynolds statement and the deposition testimony cited by the defendants, however, do not link the generally known ingredients to any specific brands. Nor do they disclose the relative concentrations of those ingredients. *See Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass.App.Ct. 937, 466 N.E.2d 138, 139–40 (1984) (although basic ingredients in cookie recipe are common to all cookie brands, particular combinations of ingredients constitute formulae that can be trade secrets). Furthermore, even if one assumed that the handful of ingredients mentioned in the written statement

19. Federal law does not resolve this issue, but it is noteworthy that the federal Labeling Act and Smokeless Tobacco Act implicitly recognize the trade secret status of the information that section 307B requires the plaintiffs to disclose to the DPH. *See* 15 U.S.C. § 1335a(b)(2)(A) (composite list of cigarette ingredient information submitted to the U.S. Department of Health and Human Services "shall be treated as trade secret or confidential information" subject to criminal penalties under the federal Trade Secrets Act, 18 U.S.C. § 1905); 15 U.S.C. § 4403(b)(2)(A) (composite ingredient disclosures "shall be treated as a trade secret or confidential information"). The brand-specific rank-ordering of ingredients required by the Disclosure Act goes beyond what must be disclosed under the federal statutes.

20. *See* Defs.' App. of Exs., Vol. III, Ex. 12, p. 1; *see id.* Vol. IV: Gonterman Dep. ¶¶ 32–34, 78 and ¶¶ 130–32 (identifying carbon dioxide, cellulose fiber, ethyl alcohol, triacetin, and menthol); Williams Dep. ¶¶ 86–87; Prizer Dep. ¶ 28; Norman Dep. ¶ 30 (identifying diammonium phosphate) and ¶¶ 108–09 (identifying tartaric acid and vanillin).

21. *See* Lawrence Aff. ¶ 21 (If R.J. Reynolds learned the identity of any ingredient in competitor's brand, it "would substantially assist our ability to develop a cigarette with flavor, taste, aroma indistinguishable from one of our competitors.")

and deposition testimony are so common that their use does not constitute a trade secret, there are hundreds of *other* ingredients used, according to reports filed under the Labeling Act and Smokeless Tobacco Act.[22] Those other ingredients have not been linked to specific brands or arrayed according to their prevalence of use, and the disclosure of a relatively small number of ingredients is not equivalent to a surrender of confidentiality as to the whole list.[23]

The amount of effort and money spent in developing the information is an important factor in the determination whether the information can be treated as a trade secret. *See USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 393 N.E.2d 895, 897 (1979) (trial court properly found that machine was trade secret where its development took considerable time, effort, and expense, and was extremely difficult). The plaintiffs' uncontroverted affidavits show that they have invested millions of dollars to develop their specific brand recipes.

The relative ease or difficulty by which the secret information could be legally acquired or duplicated by others is another important factor in deciding whether the information is a trade secret. *See, e.g., Jet Spray*, 282 N.E.2d at 926 (proof of trade secret violation where it would have taken three extra months to complete development of rival soda fountain absent improper use of competitor's confidential report). Despite regular efforts by various of the plaintiffs to monitor competing brands and to reproduce those brands' flavorings, to date the companies have failed to reverse-engineer brand-specific recipes.[24] A complete ingredient list with ingredients listed in descending order by weight would advance the feasibility of duplicating the taste and aroma of a competitor's brand.[25]

Finally, in addition to the expense of development, the plaintiffs' evidence establishes that the distinctive brand flavorings convey substantial competitive advantages. Whether the specific dollar amounts asserted are precisely accurate or not, the defendants have not offered evidence that would create a genuine dispute as to this fact.

In sum, the record evidence establishes that the ingredient information required to be divulged to the DPH by the Disclosure Act constitutes trade secret property under Massachusetts law.

## II. *Unconstitutional Taking of Property*

The plaintiffs claim that the Disclosure Act violates the constitutional requirement, found in the Fifth Amendment and applicable to the States through the Fourteenth Amendment, *see Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 228, 17 S.Ct. 581, 41 L.Ed. 979 (1897), that the government may not confiscate or destroy

---

**22.** *See* Saxner Aff., Jan. 28, 1997, Exs. 1, 2 (list of ingredients disclosed by plaintiffs under these federal statutes).

**23.** In a game of cards, every player knows that each of the others holds a subset of a known 52–card universe, but none knows exactly what combination of those known cards is held by any other player. And even after some have been played, the cards still held in the hand remain a mystery to the other players. The tobacco companies have filed a composite list of all the ingredients in any brand of cigarettes—the full deck of cards. That everyone knows what ingredients make up the universe does not help anyone divine the particular combination used in any one product.

**24.** *See* Norman Dep. ¶¶ 8–12, 21; Defs.' Vol. III, Ex. 1, Bates Dep. p. 140 (reverse-engineering techniques constantly being improved); Pls.' Statement of Undisputed Facts, CV96–11619–GAO, ¶ 16. The cigarette manufacturer plaintiffs report that they have tried to reverse-engineer one popular brand, Marlboro, with no success. *See* Gonterman Dep. ¶¶ 58, 68, 119, 124, 125; Lawrence Dep. ¶¶ 67–79, 117. Smokeless tobacco product manufacturers also seek to discover competitors' flavorings. *See* Defs.' Vol. III, Exs. 21–22.

**25.** *See* Lawrence Dep. ¶¶ 85–86, 188–89; Williams Dep. ¶¶ 64–66; Norman Dep. ¶¶ 88–89.

private property unless it makes "just compensation" to the owner of the property. According to the plaintiffs, the compelled disclosure and public availability of trade secret information destroys the economic value of the trade secret and constitutes a "taking" of property within the meaning of the constitutional clause. Since neither the Disclosure Act nor any other provision of Massachusetts law provides for compensating the tobacco companies for the lost economic value of their trade secret information, such a taking would contravene the constitutional prohibition against takings without just compensation. The defendants respond that the plaintiffs' takings claim is neither ripe nor meritorious.

*Ripeness.*

A facial challenge to a statute under the Takings Clause may be considered ripe for adjudication only if the enforcement of the statute would necessarily result in a taking of property by the government. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 295, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In the present context, the taking would occur when and if the DPH makes trade secret information available for public disclosure, because at that point the plaintiffs would be deprived of the value of the information as a trade secret. The defendants contend that the taking event—public disclosure—is not certain to occur with respect to the information disclosed to the DPH by any particular plaintiff, because the preconditions to public disclosure set forth in the statute might not be satisfied in any particular case. That is, the DPH might not determine that "there is a reasonable scientific basis for concluding that the availability of such in-

formation could reduce risks to public health," and the Attorney General might not advise "that such disclosure would not constitute an unconstitutional taking." *See* Mass. Gen. Laws ch. 94, § 307B. The defendants urge that no controversy about the public disclosure of secret information is ripe for adjudication until those decisions have been made about particular submitted ingredient lists. The plaintiffs, on the other hand, argue that public disclosure of the ingredient information is the fundamental objective of the statute and that the determinations of the DPH and the Attorney General that must precede disclosure are, as a practical matter, foregone conclusions. If the statute is permitted to take effect, it will inevitably lead to the public disclosure of trade secret information, and that inevitability makes the present challenge to the effectiveness of the statute ripe for decision under the *Hodel* standard.

To resolve this issue, it is necessary to consider in detail how the statutory scheme would work in practice. The Disclosure Act and the regulations adopted to implement it require tobacco manufacturers to submit specific product ingredient information to the DPH. Information that any manufacturer designates confidential is to be kept under strict security precautions, including the use of locked file cabinets and limitation of access. There are penalties for unauthorized disclosure or leaking of the information, including the possibility of criminal prosecution. *See* Mass. Regs.Code tit. 105, § 660.200(H). The DPH will maintain the confidentiality of the information unless and until it, and then the Attorney General, have made the determinations required by the Disclosure Act.[26]

---

**26.** In February 1999, the DPH promulgated a regulatory amendment that would require it to stay disclosure if, within sixty days after the Attorney General gives authorization to disclose, a "complaint [is] filed in a court of competent jurisdiction challenging disclosure of the information on the grounds that disclosure would make available to the public a

trade secret." 105 Code Mass. Regs. tit. § 660.200(G)(2), (H). (The full text of the regulation is printed in note 31, *infra.*, at 146–47.) The information would remain confidential until either judicial resolution of the case or the parties give their consent to its publication. *Id.*

The first determination—whether there is a reasonable scientific basis for concluding that the public disclosure of product-specific ingredient information could reduce public health risks—is certain to be resolved in favor of disclosure. To reach this conclusion, one need not consider the statements of the Disclosure Act sponsors and of DPH officials that they intend to make the information public, although the frankness of those statements is hard to ignore. It is sufficient to consider only the language of the statute itself.

The statute in effect poses the following question to the DPH about any particular ingredient list: "Is there a reasonable scientific basis for concluding that the disclosure of this list could reduce risks to public health? Yes or no?" On its face, this appears to be an even-handed question that in the abstract would equally permit either an affirmative or a negative answer. As a practical matter, however, the utter implausibility of a negative answer to the question by the DPH is patent. To respond negatively, the DPH would have to be prepared to state officially that there was *no* reasonable scientific basis for con-

cluding that public disclosure *could*—i.e., "might"—reduce risks to the public health.[27] The statute does not itself specify what would constitute a "reasonable scientific basis," although related concepts of Massachusetts evidence law suggest that the standard, though not satisfied by the mere assertion of scientific basis by a supposed expert, *see In re Canavan,* 432 Mass. 304, 733 N.E.2d 1042 (2000), would be met by a minimal showing of reliability, without having to establish general acceptance in the scientific community. *See Commonwealth v. Lanigan,* 419 Mass. 15, 641 N.E.2d 1342, 1349 (1994); *cf. Vassallo v. Baxter Healthcare Corp.,* 428 Mass. 1, 696 N.E.2d 909, 915 n. 9, 916–17 n. 10 (1998) (applying *Lanigan* to uphold admission of expert testimony on silicone breast implants where scientific basis was questionable, results could not be specifically confirmed, and no supporting epidemiological studies existed). The statute does not call upon the DPH to follow "better" or "more convincing" scientific views, but rather obliges the DPH to clear the way for publishing the lists unless there is *no* reasonable scientific basis for concluding

Though purportedly promulgated under § 307B, the regulation contradicts the statute, which plainly provides that tobacco ingredient information *"shall* be public records" (emphasis added) after the DPH and Attorney General have performed their respective roles. Under Massachusetts law, the public would have a right to compel the release of the information once it has become a "public record." *See* Mass. Gen. Laws ch. 66, § 10; ch. 4, § 7 cl. 26 (defining "public record" and exceptions); *see also Globe Newspaper Co. v. Police Comm'r of Boston,* 419 Mass. 852, 648 N.E.2d 419, 423–24 (1995) (compelling disclosure of public record material compiled in an internal affairs division investigation into police misconduct).

The DPH does not have authority to regulate in a manner contrary to the clear mandate of the statute. *See Electronics Corp. of Am. v. Commissioner of Revenue,* 402 Mass. 672, 524 N.E.2d 1338, 1340–41 (1988) (invalidating regulation limiting taxpayer remedies to the extent that it sought to impose restrictions contrary to the clear language of the applicable statute). Nor may this Court supply an interpretive gloss to a state statute that

its plain language will not support. *See Consolidated Cigar Corp. v. Reilly,* 218 F.3d 30, 56 (1st Cir.2000).

**27.** The defendants do not seriously dispute that some of the ingredient information is likely to be found eligible for disclosure under this standard, but they argue that the DPH may determine that the public health will be served by disclosure of only some of the ingredients on a list, not the whole list. They then argue that the matter is not ripe for decision until it is determined how much of any given list will be approved for disclosure.

That argument does not help them. A partial disclosure would still be the disclosure of previously secret information in which the plaintiffs have a property interest. The damage to the plaintiffs might be less if less is disclosed, but the ripeness inquiry is not concerned with the ultimate valuation (or even evaluation) of the plaintiffs' taking claim, but rather with the actuality of the controversy. An inevitable taking of part of the plaintiffs' property suffices as much to establish a ripe controversy as an inevitable taking of the whole.

that disclosure could reduce risks to public health.[28] The record makes clear that such a determination by the DPH is so unlikely that it can be concluded that the opposite answer—an affirmative one to the question—is all but foregone.

The second determination required by the statute is the Attorney General's "advice" concerning whether public disclosure of a particular list "would constitute an unconstitutional taking of property." Mass. Gen. Laws ch. 94, § 307B. The defendants say that until the Attorney General is called upon to consider a particular ingredient list of a particular manufacturer, it is a matter of speculation what his "advice" might be with respect to any such list. Since his opinion might be, in a given case, that the disclosure *would* constitute an unconstitutional taking if it occurred, thus blocking the public disclosure (and thus saving the owner of the information from any loss), no plaintiff can allege a present harm sufficient to make for a controversy ripe for adjudication.

Again, the argument has a superficial appeal in the abstract. But in the particular circumstances of *this* controversy, there is no uncertainty as to what the advice would be. Whether the publication of the plaintiffs' product-specific ingredient lists would constitute an unconstitutional taking of their property depends on two other key questions: whether the plaintiffs have a protectable trade secret property interest in the ingredient information, and whether, if they do, the compelled public disclosure of that information would constitute a taking of property within the meaning of the Fifth Amendment. As noted *supra,* the former question (whether the plaintiffs' ingredient lists are trade secrets) is a matter of state law, determined by application of the considerations articulated in *Jet Spray.* The latter question

(whether the compelled disclosure of trade secrets constitutes a taking of property to which the Takings Clause applies) is a matter of federal constitutional law, determined largely by application of a body of precedent from the Supreme Court, as well as by reference to the decisions of lower federal courts and state courts.

The Attorney General has already expressed in this litigation his positions on both questions of law. His positions are (1) that the plaintiffs do not have a trade secret interest in their ingredient information under Massachusetts law (*see, e.g.,* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J., at 6–8), and (2) that even if they do, the Disclosure Act's requirement that the information be disclosed in the interest of the public health and welfare does not constitute a taking within the meaning of the Fifth Amendment (*see id.* at 26–36). He has articulated those positions not in the abstract, but specifically with reference to the evidence contained in the summary judgment record in this case.

There is no further "ripening" of the issues that needs to—or that will—occur. It might be proposed that the Attorney General may later change his current opinion and conclude, contrary to his expressed position here, that disclosure of a particular ingredient list submitted under the statute would result in an unconstitutional taking. Again, however, with respect to the ingredient lists for the plaintiffs to this suit, the Attorney General has already considered the relevant specifics. That is, he has considered with respect to these plaintiffs specifically whether they have trade secrets as measured under Massachusetts law and whether the compelled disclosure of such secrets without compensation would be permitted under federal constitutional law. There is no

---

**28.** The laxity of the "reasonable scientific basis" requirement is compounded by the statute's very low standard for relevance to the public health: that the information "could" reduce risks. Cf. *Dolan v. City of Tigard,* 512 U.S. 374, 395–96, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (noting the substantial difference between a finding that a measure "could" have a particular effect, and a finding that it "will" or "is likely to" have such an effect).

different or additional information material to his opinion on these issues that will become available for consideration only after the actual lists are submitted. The only additional information the lists will provide is the identification and ordering of the actual ingredients in particular products. But the specific content of the lists is not material to the determination of either legal question upon which the Attorney General's opinion must be based. The substantive content of confidential information does not affect whether the information qualifies as a trade secret under Massachusetts law, except in the respect that it must be commercially valuable. *See Jet Spray*, 282 N.E.2d at 924. On the present record, there is not genuine dispute that the information is commercially valuable to the plaintiffs. For example, it did not matter to the question whether Peggy Lawton Kitchens had a trade secret in its cookie recipe that it used walnut dust. *See Peggy Lawton Kitchens*, 466 N.E.2d at 139–40. All other things being equal, ground cardamom would have done just as nicely for the law, if not the palate. What matters is not what the secret information is, but that the information is secret. The substance of the secret can be as hum-drum as nut dust. The value inheres in the fact that no one else knows it.

Likewise, the constitutional question does not focus on the substantive content of the trade secret. It is true that the nature of the property interest affected by governmental action matters in determining whether a regulatory taking has occurred. Thus, it may be debated whether a property interest in a commercial trade secret merits protection at all under the Takings Clause. But if trade secrets merit such protection, as they do [29] the specific substantive content of the secret does not affect whether there has been a taking by disclosure of the trade secret.

In sum, the Attorney General has taken a position on the relevant facts and law in the course of this litigation. The submission of actual ingredient lists will not furnish any additional information material to his statutorily required judgment; that judgment will be made on the basis of the evidence already available to him in the record in this case, which information has been, in fact, evaluated by him. There is no contingency that must be abided before his judgment can be made. *See Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 536 (1st Cir.1995) (stating that "cases that turn on legal issues not likely to be significantly affected by further factual development" are ripe for adjudication); *Massachusetts Ass'n of Afro–Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir.1992) (stating that case is ripe if it does not involve "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all"). It is therefore possible to say that his judgment on the facts available today will be the same judgment on the same facts if made tomorrow. To suppose otherwise would be to presume a whimsy on the part of the Attorney General that it would be wholly inappropriate to do.[30]

The second part of the ripeness inquiry "focuses on the hardship that may be entailed in denying judicial review." *Ernst & Young*, 45 F.3d at 536. If judicial review is denied at this stage, the statute's application (as described *supra* ) will result in the disclosure of secret ingredient information. The harm the plaintiffs claim they will suffer flows directly from such

---

**29.** *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

**30.** Similarly, it is inappropriate to entertain any thought that the Attorney General's opinion expressed in this case is simply a "litigation position" and does not necessarily represent his conscientious judgment if the matter were to be considered in due course under the statute. The Attorney General is entitled to a presumption of good faith, and it may accordingly be presumed that the views he advocates here are the views he would act on in discharging his statutory obligation, should he be permitted to exercise it.

disclosure; in fact, the harm *is* the disclosure. And that harm cannot be undone, since the genie, once out, cannot be put back in the bottle. The plaintiffs' claims satisfy the second prong of the ripeness inquiry.

For these reasons, the controversy is ripe for adjudication. To the extent that the disclosure mandated under the statute would result in constitutional injury, "[w]e need not wait for the inevitable to confirm and magnify" it. *Santa Fe Indep. Sch. Dist. v. Doe,* — U.S. —, —, 120 S.Ct. 2266, 2282, 147 L.Ed.2d 295 (2000).

*The merits.*

■ What happens when the State orders a person to disclose for publication a commercial trade secret? According to the plaintiffs, what happens is that the State "takes" a private property interest from its owner in service of a public good. When a State "takes" private property, the Constitution requires that "just compensation" be made for the property owner's loss. Neither the Disclosure Act nor any other provision of Massachusetts law provides for the payment of compensation to the plaintiffs for whatever loss they would sustain by reason of the publication of their commercial trade secrets. In fact, it seems clear from the Act that Massachusetts does not intend to pay compensation; as noted above, the public disclosure of the plaintiffs' ingredient information is conditioned on the state Attorney General's advice that Massachusetts can disclose it without paying compensation. Since in the absence of compensation Massachusetts may not "take" the property, within the meaning of that term as used in the Fifth Amendment, the heart of the present controversy is whether the Disclosure Act accomplishes a "taking."

Some governmental acts, such as the explicit use of the inherent sovereign power of eminent domain, are unambiguously and uncontroversially "takings." Here, however, rather than acknowledging that it is "taking" private property for public use, Massachusetts to the contrary insists

that it is not. The defendants say that the Disclosure Act is a valid exercise of the Commonwealth's traditional police power to promote and protect the public health. Regulation imposed under authority of the police power necessarily limits what individuals may do with their private property, especially in commercial activity; indeed, that is the whole point of exercising the police power. Collaterally, though it is not an intended objective of the police power, it is often a necessary consequence of its exercise that the economic value of the regulated property or activity may be diminished, sometimes drastically, with the property owner having no right to compensation for the loss. *See e.g., Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (upholding prohibition of sale of eagle feathers).

■ On the other hand, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). How far is "too far?" That depends. The question cannot be answered by application of a "set formula"; rather, in every case in which a regulatory taking is claimed there must be an "essentially ad hoc, factual inquir[y]." *Penn Cent. Transp. Co. v. New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *See also, Pennsylvania Coal,* 260 U.S. at 416, 43 S.Ct. 158 ("[T]his is a question of degree—and therefore cannot be disposed of by general propositions."). Whether there has been a "regulatory taking" is evaluated by considering, on the particular facts of each case, "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). The inquiry must take into account the "specific property, and the particular estimates of economic

impact an ultimate valuation relevant in the unique circumstances." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

The defendants rely heavily on the first factor in the evaluation—the character of the governmental action involved—and emphasize, rightly, that the Commonwealth has broad police power to regulate matters bearing on the public health or welfare. It is certainly true that the police power is traditionally a broad power, and economic actors like the plaintiffs must always accept that their interests may be required to yield to an appropriate exercise of that power. But there is a limit, and a State cannot truncate the inquiry simply by playing the "police power" trump. Even properly motivated exercises of the police power can go "too far" and result in a taking of property for which compensation must be made. *See Pennsylvania Coal*, 260 U.S. at 415–16, 43 S.Ct. 158. *See also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ("If … the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].' ") (quoting *Pennsylvania Coal*, 260 U.S. at 415, 43 S.Ct. 158) (alterations in *Lucas*).

One of the considerations endorsed by the Supreme Court for deciding whether an exercise of the police power has gone "too far" is to ask whether the effect of the governmental action is to deprive the property owner of "economically viable use" of the property. *See Lucas*, 505 U.S. at 1014–16, 112 S.Ct. 2886 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). In the present case, that question could receive an ambiguous answer, depending on how broadly the property interest is defined. On the one hand, the plaintiffs may continue to manufacture products in accordance with their existing ingredient recipes, so they retain the economic use of the information, though after publication it may also be used by others as well. In this broader sense, the economic value of the information may be significantly lessened, but it is not eliminated. *See Dolan v. City of Tigard*, 512 U.S. 374, 385 n. 6, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). On the other hand, the publication of secret product information would entirely deprive the holder of the economic value and viability of the *secrecy* of the information. If, then, the relevant property interest is the secrecy of the trade secret, it would be fair to say that the owner is deprived of all economically viable use of *that* property interest, since publication extinguishes the interest by destroying the secrecy. The latter scope of definition is the appropriate one. In *Monsanto*, for example, the takings question concerned the company's loss of the secrecy of its data, not its ability to continue to use the data at all. Monsanto retained the use of this information, but others also could use it.

The Supreme Court has consistently recognized that one of the fundamental attributes of private property is the owner's right to exclusive use of the property. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) and *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). Exclusivity is more than just an important aspect of a proprietary interest in a trade secret. It is the very source of the proprietary interest itself. Through secrecy, the owner excludes others from the use of the information. If the veil of secrecy is lifted, exclusivity is extinguished and the proprietary interest essentially vanishes. The Court has consistently held that the extinction of a property interest—even an intangible one such as an interest in a trade secret—may constitute a taking. *See Monsanto*, 467 U.S.

at 1003, 104 S.Ct. 2862 (citing *Armstrong v. United States*, 364 U.S. 40, 44, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (extinction of materialman's lien); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596–602, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (extinction of real estate lien); *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (abrogation of valid contracts)).

The other prominent factors for this regulatory takings analysis—the economic impact of the governmental action and its interference with reasonable investment-backed expectations—weigh here in the plaintiffs' favor. On the summary judgment record, it is clear that the plaintiffs have made substantial investments in the development and protection of their brand-specific ingredient information, and that there would be a substantial loss of competitive advantage if they were required to disclose that information for publication by the Commonwealth.

The defendants urge, however, that the plaintiffs can avoid the loss of their trade secrets simply by withdrawing from sale in Massachusetts any product manufactured using the secrets. Under the Disclosure Act, the plaintiffs only need to disclose ingredient information with regard to products sold in Massachusetts. By offering their products for sale in Massachusetts, the defendants argue, the plaintiffs inexplicitly accept the disclosure requirement. If they wish to avoid the disclosure requirement, they may refrain from selling tobacco products in the Commonwealth.

The argument must be rejected. In the first place, it represents an incorrect application of the Supreme Court's decision in *Monsanto*. In that case, the Court held that Monsanto's voluntary submission of confidential data to the Environmental Protection Agency ("EPA") under the regulatory apparatus established under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.*, did not constitute a taking within the scope of the Fifth Amendment. As is not unusual with intricate regulatory schemes, there was some good news and some bad news for the regulated companies under FIFRA. Though it imposed some burdens and obligations, the regulatory regime conferred some benefits as well. The exchange was both voluntary enough and fair enough, in the judgment of the Supreme Court, that it could not be said that Monsanto's property interest in its confidential information had been "taken" by the government.

This case is different. Here, there is no regulatory scheme with both burdens and benefits; there is only burden. The burden is that the plaintiffs must disclose their trade secrets. The proposed "benefit" is that they may continue to do what they had been doing without burden before the enactment of the Disclosure Act, selling their products within Massachusetts. That "benefit" is not similar to the give-and-take exchange that the Court approved in *Monsanto*. *See Philip Morris*, 159 F.3d at 679 ("[P]ermission to continue operating a lawful business is not the type of government benefit on which a *Monsanto*-type exchange validly may be predicated."); *id.* at 677 ("[T]he mere granting of permission to engage in routine activities, incident to existing property rights, does not afford compensation sufficient to support a *Monsanto*-like exchange."). *See also Nollan*, 483 U.S. at 833–34 n. 2, 107 S.Ct. 3141 (explaining *Monsanto* and stating that the government's "announcement that the application for (or granting of) [a building] the permit will entail the yielding of a property interest cannot be regarded as establishing the voluntary 'exchange' ... that we found to have occurred in *Monsanto*") (citations omitted).

The defendants have also suggested that since Massachusetts law creates the protection for trade secrets, Massachusetts may withdraw that protection. (Here, of course, any withdrawal would be highly selective, not abolishing the law of trade secrets for Massachusetts but rather only withdrawing trade secret protection for a

particular category of disfavored (but legal) products, while leaving it intact for all others.) This argument rests on the positivist notion that since, in a broad sense, all property rights emanate from the State, the State is free to take them away whenever it determines to do so. That proposition must be rejected. As one commentator has noted:

> To the degree that private property is to be respected in the face of republican and positivist visions, it becomes necessary to resist even an explicit government proclamation that all property acquired in the jurisdiction is held subject to government's limitless power to do with it what government wishes. Indeed, government must be denied the power to give binding force to so sweeping an announcement, whether explicit or implicit, if we are to give content to the just compensation clause as a real constraint on federal power and, through the fourteenth amendment, on state and local power. But this shows that the expectations protected by the clause must have their source outside positive law. Grounded in custom or necessity, these expectations achieve protected status not because the state has deigned to accord them protection, but because constitutional norms entitle them to protection.

Laurence H. Tribe, *American Constitutional Law,* 608 (2d ed.1988).

In summary, then, the record establishes that the plaintiffs have valuable property interests in confidential brand-specific ingredient information; the confidential information qualifies as trade secret information under the laws of Massachusetts; the inevitable effect of the Disclosure Act will be to compel the public disclosure of some or all of the trade secrets; by destroying the secrecy of the information, public disclosure deprives the plaintiffs of their property interest in the trade secrets; the Commonwealth's deprivation of the property interest in the secrets is a "taking" for which the Fifth and Fourteenth Amendments require just compensation to be made; there is neither provision for, nor a prospect of, compensation to the plaintiffs for the taking that would be effected by the Disclosure Act; and therefore, the plaintiffs are entitled to an injunction preventing the taking without compensation, that is, preventing the defendants from acting to enforce the provisions of the Disclosure Act requiring the plaintiffs to submit brand-specific ingredient information.

III. *Violation of Due Process*

██ The Constitution imposes procedural constraints on state decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment. Fundamentally, the Due Process Clause requires that " 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951)).

██ The exact contours of that required opportunity are shaped both by the nature of government action involved and by the number of persons affected by it. If the government proposes to adopt a rule that will apply uniformly to a large group of affected individuals, "it is impracticable that everyone should have a direct voice in its adoption" and a hearing is not required. *Bi–Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915). The fact that such an across-the-board rule may be more disadvantageous to some than to others does not change its generalized nature and thus does not require more exacting procedural protections. *See United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 246, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). But where a relatively small number of persons are concerned, who are each exceptionally affected, and in each case on individual grounds, they have a right to a hearing. *See Bi–Metallic,* 239 U.S. at 445–46, 36 S.Ct. 141 (citing *Londoner v. City of Den-*

ver, 210 U.S. 373, 385, 28 S.Ct. 708, 52 L.Ed. 1103 (1908)); *Florida East Coast Ry. Co.*, 410 U.S. at 244–45, 93 S.Ct. 810. Furthermore, if the government action will permanently deprive an individual of property, a predeprivation hearing must be provided, affording procedural safeguards that would not themselves be more costly than the risk of erroneous deprivation. *See Mathews*, 424 U.S. at 332, 335, 96 S.Ct. 893. The judicial inquiry in the case of a claim of a denial of due process is whether adequate process has been provided. Under the *Salerno* standard, if there exists a set of circumstances such that the procedures would be sufficient, the statute may not be held invalid on its face.

Here, the Disclosure Act and its implementing regulations direct two administra-tive agencies, the DPH and the Attorney General, to make a two-step determination as to whether the plaintiffs' tobacco product ingredient information shall be placed into the public domain. As has been described, before any public disclosure of tobacco product ingredient information occurs, the DPH must conclude that "there is a reasonable scientific basis for concluding that the availability of such information could reduce risks to public health" and the Attorney General must conclude that "such disclosure would [not] constitute an unconstitutional taking." Mass. Gen. Laws ch. 94, § 307B. *See also* Mass. Regs. Code tit. 105, § 660.200 *et seq.*[31]

Under the regulations adopted to implement the Disclosure Act, after receiving a

31. Mass. Regs.Code tit. 105, § 660.200 provides, in relevant part, that:

(A) After receipt of an annual report filed pursuant to 105 CMR 660.101, the Department shall make a written preliminary determination as to whether there is a reasonable scientific basis for concluding that the public availability of some or all of the added constituent information contained in the report could reduce risks to public health, which determination shall include the Department's reason(s) for proposing to make the information available.

(B) If the Department preliminarily determines that making available the information about some or all of the added constituents is warranted under M.G.L. c. 94, § 307B and 105 CMR 660.000, the Department shall so notify the manufacturer of each added constituent proposed to be made available and shall provide the manufacturer its written preliminary determination. The manufacturer shall have 60 days after its receipt of the written preliminary determination to provide written comment to the Department on the preliminary determination.

(C) Following expiration of the 60 day response period specified in 105 CMR 660.200(B), the Department shall make a final written determination, including the reasons for so deciding, if it finds that there is a reasonable scientific basis for concluding that making available to the public information about some or all of the added constituents could reduce risks to the public health.

(D) In the event the Department makes the determination referred to in 105 CMR 660.200(C), it shall request the advice of the Attorney General as to whether making available this information to the public would constitute an unconstitutional taking of property. Information submitted to the Department pursuant to 105 CMR 660.101 and 660.200(B) shall be regarded by the Department as confidential, and shall not be made available to the public, during the period in which the Department is awaiting advice from Attorney General pursuant to 105 CMR 660.200(D).

(E) In the event that the Attorney General advises the Department that making available to the public information about some or all of the added constituents referred by the Department pursuant to 105 CMR 660.200(D) would not constitute an unconstitutional taking, the Department shall give the manufacturer 60 days written notice of the information to be made available. At the end of the 60 day period, the Department shall make such information available to the public for inspection and copying.

(F) The Department shall treat information submitted pursuant to 105 CMR 660.101 as confidential unless and until:

(1) a determination to release the information is made in accordance with 105 CMR 660.200(A) through (E) and the 60 day period referred to in 105 CMR 660.200(E) has elapsed; or

(2) a manufacturer notifies the Department in writing that it does not consider information it has submitted pursuant to 105 CMR 660.101 to be confidential.

(G) A manufacturer submitting written comments to the Department pursuant to 105 CMR 660.200(B) may request that its

brand-specific ingredient list from a tobacco company, the DPH must make a written preliminary assessment as to whether all or part of it should be released. If it decides that there is a reasonable scientific basis for concluding that publicizing the information could reduce public health risks, the DPH communicates that preliminary determination, and the reasons for it, to the affected manufacturer. The manufacturer then has sixty days to provide comments to the DPH, presumably in an effort to persuade the DPH to change its position. After the comment period has expired, the Department makes its final written determination. *See* Mass. Regs. Code tit. 105, § 660.200(A)-(C).

As discussed above, the DPH may not base its decision on whether publicizing the information would be likely to reduce risks to public health; it must only examine whether there is a "reasonable scientific basis" for concluding that it could do so. The Disclosure Act obliges the DPH to recommend disclosure unless there is *no* reasonable scientific basis for concluding that disclosure could reduce risks to public health. There is no reason to expect that the DPH would conclude, in effect, that providing more information to consumers about the ingredients of tobacco products *could not* reduce public health risks. After all, the very premise of the statute is to the contrary: manufacturers of tobacco products should be required to disclose what is in their products so consumers may know more about what they consume and, presumably, think better of it. It taxes credulity to think that the tobacco product ingredient information would not be designated for public disclosure under any good-faith application of the statutory standard.

In an effort to suggest there is some uncertainty as to how the statute will be applied, the defendants have urged that the statute gives the DPH discretion to develop policies for applying the standard judiciously. However, the plain language of the statute prevents the DPH from exercising such discretion.[32] If the "reasonable scientific basis" standard is satisfied and the Attorney General's advice is that disclosure would not be an unconstitutional taking, the ingredient lists "shall be public records." Mass. Gen. Laws ch. 94, § 307B. The command could not be plainer, and (as discussed in note 26) the Department has no authority to interpret "shall" as "may."

As a practical matter, then, while the regulations provide the plaintiffs an opportunity to be heard before the DPH issues its determination, the opportunity is not a meaningful one, because there is only one plausible outcome under the statutory standard. It is not conceivable that the DPH would fail to find the statutory stan-

submission, and any preliminary or final determinations by the Department pursuant to 105 CMR 660.200, be treated as confidential. The Department will thereafter treat such submission(s) and determinations as confidential to the extent permitted by law; provided, however, that upon making information available to the public pursuant to 105 CMR 660.200(E), the Department shall no longer treat as confidential the preliminary and final determinations it rendered, or any written comments submitted by a manufacturer.

(H) The Commissioner shall establish written procedures to maintain the confidentiality of information treated as confidential pursuant to 105 CMR 660.200(F) and (G). Such procedures shall include the designation of a duly authorized agent to serve as custodian of such information. The agent shall:

(1) take physical possession of the information and, when not in use by a person authorized by the Commissioner to have access to such information, store it in a locked cabinet or file; and

(2) maintain a list of persons authorized by the Commissioner to have access to such records and a daily log of each person who inspects the information. Such procedures shall require that any person permitted access to the information shall be instructed in writing not to make available the information to anyone who is not entitled to have access to the information, and informed of the penalties for failing to comply.

**32.** *See,* note 26, *supra,* at 138–39.

dard satisfied, not because of any manipulation or bad faith on the part of the agency, but simply because the standard itself is so obviously susceptible to being satisfied by the most minimal demonstration. In other words, there is process available; what is wanting is substance to that process.

The second crucial prerequisite to making the information public is the advice of the Attorney General that disclosure would not effect an unconstitutional taking of the plaintiffs' property. Neither the Disclosure Act nor the regulations make any provision for an opportunity for the plaintiffs to be heard by the Attorney General before he makes that determination. Furthermore, the Massachusetts statute that generally authorizes the Attorney General to render advice to other state officials provides no safeguard to check against the possibility of an erroneous conclusion, probably because his opinions ordinarily are truly advisory, without rights-altering legal effect. *See* Mass. Gen. Laws ch. 12, §§ 3, 9; *cf. Answer of the Justices,* 364 Mass. 838, 302 N.E.2d 565, 568 (1973) (declining, for want of "solemn occasion," to answer governor's questions and stating that the advice sought was so advisory that it fell squarely within the Attorney General's purview). The determination that would make trade secrets public, however, does alter the plaintiffs' rights. If the Attorney General advises that disclosure would not effect a taking, the information will be made available to the public. There is no opportunity for the manufacturer to be heard by the Attorney General. *See* Mass. Regs.Code tit. 105, § 660.200(D)-(F).

■ This aspect of the decision making prescribed by the Disclosure Act, under any conceivable set of circumstances, fails to pass constitutional muster under the Due Process Clause. The Attorney General's office is a state "agency" for the

purposes of the Massachusetts administrative procedure statute, *see* Mass. Gen. Laws ch. 30A, § 1(2); *Purity Supreme, Inc. v. Attorney General,* 380 Mass. 762, 407 N.E.2d 297, 303 (1980), and if the Attorney General makes an adjudicatory decision, he must provide the same procedural opportunity for affected persons to be heard as any other agency must. The decision required of the Attorney General by the Disclosure Act is the very paradigm of a decision that would exceptionally affect an individual manufacturer, and thus falls squarely within the category of government actions for which a hearing must be provided. *See General Chem. Corp.,* 474 N.E.2d at 186. The availability of judicial review after the fact does not make up for the lack of an opportunity to be heard in a manner that may influence the administrative determination before it becomes final, especially when that determination concerns a form of property as evanescent and in danger of compromise as a trade secret. *See Carson Prods. v. Califano,* 594 F.2d 453, 459 (5th Cir.1979); *Zotos Int'l, Inc. v. Kennedy,* 460 F.Supp. 268, 278–79 (D.D.C.1978).

A meaningful opportunity to be heard is one that provides a reasonable prospect of persuading the decisionmaker. Neither the Disclosure Act itself nor its implementing regulations provides such an opportunity with respect to the two critical decisions the statute requires. Accordingly, it must be concluded that the statute violates the Due Process Clause of the Fourteenth Amendment.

## IV. *Dormant Commerce Clause*

■ The plaintiffs also argue that the Disclosure Act violates the so-called "dormant" aspect of the Commerce Clause, the doctrine that States may not, without the consent of Congress, engage in regulation that discriminates against or excessively burdens interstate commerce.[33] *See*

---

33. The doctrine is "dormant" because it is not expressed in the Constitution, but is drawn by negative implication from the explicit grant to Congress of the power to regulate interstate commerce. *See* Laurence H.

*Wyoming v. Oklahoma,* 502 U.S. 437, 454–55, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). One of the fundamental political axioms of the federal Union established by the Constitution is that "[n]o State can legislate except with reference to its own jurisdiction." *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (quoting *Bonaparte v. Tax Court,* 104 U.S. 592 594, 26 L.Ed. 845 (1881)). *See also Huntington v. Attrill,* 146 U.S. 657, 669, 13 S.Ct. 224, 36 L.Ed. 1123 (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states."). The dormant Commerce Clause is consistent with this axiom. State laws that have "the 'practical effect' of regulating commerce occurring wholly outside that State's borders" are invalid. *Healy v. Beer Inst.,* 491 U.S. 324, 332, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). Even facially neutral laws may violate the Commerce Clause if, though they purport to regulate evenhandedly, they impose undue burdens on interstate commerce that clearly outweigh any putative local benefits. *See Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

A seamless consistency is decidedly absent from the body of judicial precedents in this area. In the present case, both sides are respectably able to draw support for their opposing views from different precedents. One reason for this is that the cases dealing with the dormant Commerce Clause have been resolved on a particularized analysis, and the same general expressions of doctrine may be found in cases having very different outcomes. In some senses, the plaintiffs' argument here pushes the dormant Commerce Clause envelope a bit. Because it is a novel argument, there is no case so closely

analogous to this one that its outcome—and the expressed justification for that outcome—controls the resolution of the present issue. In the absence of a suitable factual analogue, the matter must be decided by considering what the fundamental principles underlying the dormant Commerce Clause require under this newly presented factual predicate.

In *Healy,* 491 U.S. 324, 109 S.Ct. 2491, the Supreme Court held unconstitutional under the dormant Commerce Clause a Connecticut statute regulating the price of beer sold in Connecticut by reference to sellers' prices for beer in neighboring States. Having examined the way the statute worked in practice, the Court concluded that "the Connecticut statute has the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State." *Id.,* 491 U.S. at 337, 109 S.Ct. 2491. To be sure, there are noticeable differences in factual circumstance between *Healy* and the present case. Among other things, *Healy* dealt with state regulation of prices, clearly economic regulation, whereas the Disclosure Act seeks to promote the public health. But *Healy* is significant for present purposes in an important respect. In *Healy,* the Court evaluated the statute by considering not just what it said, but what its practical effect would be. 491 U.S. at 339–40, 109 S.Ct. 2491. This inquiry into the "practical effect" of a challenged regulation has been consistently endorsed by the Court. *See, e.g., Brown–Forman,* 476 U.S. at 583, 106 S.Ct. 2080; *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

■ In the present case, the "practical effect" of the Disclosure Act would be to alter competitive relationships in the market for tobacco products in places wholly outside Massachusetts by withdrawing from the plaintiffs the competitive advantage they would otherwise have in those

Tribe, *American Constitutional Law,* 1029 (3d ed.2000).

places by reason of their ingredient trade secrets. A property interest in trade secrets is not only intangible, but it is also ubiquitous. It is not a localized interest. Its economic value inheres in the competitive advantage it gives its owner wherever the products it pertains to are sold. Conversely, when the secret is disclosed, the economic value it had contributed to the product disappears everywhere the product is sold. The effect of requiring disclosure of the secret cannot be localized within a single State. It is inevitable that a requirement by one State that a manufacturer reveal its trade secrets will, by making the formerly secret information available to competitors, have the consequence of altering competitive conditions with respect to the manufacturer's products everywhere they are sold, both inside the State's own territory and outside as well. "States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market." *Healy,* 491 U.S. at 339, 109 S.Ct. 2491 (quoting *Brown–Forman,* 476 U.S. at 580, 106 S.Ct. 2080).[34] One of the conditions of the local market may be a state policy supporting the protection of commercial trade secrets,[35] which the Disclosure Act would not only conflict with, but override.

The Disclosure Act fails another dormant Commerce Clause test, as well. It conditions the right to sell tobacco products within Massachusetts on a seller's compliance with the mandated filing of ingredient lists. Since the plaintiffs all manufacture their products outside Massachusetts, any sales of tobacco products in Massachusetts are made in the course of interstate commerce. The condition the Disclosure Act imposes on such interstate

sales is, in the language of the cases, a "burden" on interstate commerce. "Burdens" may vary in degree, of course, and slight burdens are inconsequential for Commerce Clause analysis, so calling the effect a "burden" does not itself mean that it is unconstitutional.

If the condition to sales in Massachusetts involved simply disclosing information about a product that did not amount to a trade secret, the burden would be slight and constitutionally inoffensive. In fact, however, the condition at issue here requires the surrender of a valuable property right. That would be significant enough if the surrender were confined to the Massachusetts market, *see Philip Morris,* 159 F.3d at 677, 679, but it will not be. The condition imposed on the right to sell products within Massachusetts requires the general abandonment of whatever economic value inures to the plaintiffs from their ingredient secrets anywhere in the world. The record developed by the parties in this case indicates that would be a substantial loss.

So the rule described in *Pike* is also applicable: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. 844 (emphasis added). The question to be resolved is whether the burden of requiring trade secret disclosure as a condition to being allowed to sell tobacco products in Massachusetts is "clearly excessive in relation to the putative local benefits." The balancing

---

**34.** It does not matter that the extraterritorial effect is unintended. *See Healy,* 491 U.S. at 336, 109 S.Ct. 2491. Nor does it matter that the State's regulation which produces the extraterritorial effect was not intended as economic regulation, but rather as health and welfare regulation under the police power.

*See, e.g., Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).

**35.** The laws of the States where each of the plaintiffs is incorporated protect commercial trade secrets. *See* note 18, *supra,* at 135.

question is one of degree.[36] States have, as they must, substantial leeway to regulate commerce within their borders to promote the health and safety of their citizens. *See Pike,* 397 U.S. at 143, 90 S.Ct. 844; *see also Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). However, "a finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry. Such a view ... 'would mean that the Commerce Clause of itself imposes no limitations on state action ... save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods.'" *Hunt,* 432 U.S. at 350, 97 S.Ct. 2434 (quoting *Dean Milk Co. v. Madison, Wis.,* 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951)).

One factor to be considered is whether the intended benefit from the challenged regulation "could be promoted as well with a lesser impact on interstate activities." *Hunt,* 432 U.S. at 350, 97 S.Ct. 2434. The Disclosure Act aims to promote public health in Massachusetts by increasing the information available to potential consumers about what ingredients are contained in tobacco products. That is "unquestionably a legitimate local public interest." *Consolidated Cigar Corp. v. Reilly,* 218 F.3d 30, 56 (1st Cir.2000). It is impossible to predict, and would probably also be impossible to measure reliably in retrospect, how much protection might be achieved by the disclosures required by the statute. There is good reason to think that much, if not all, of the hoped-for benefit could be achieved by disclosure requirements tailored to avoid the loss of

trade secrets; one example is the aggregate ingredient lists required by the federal acts.[37] And similarly, it does not appear to be the case that achievement of the legitimate purpose of the Act must necessarily require that the plaintiffs' trade secrets be destroyed. It must be concluded that the particular burden that the Disclosure Act imposes on the plaintiffs, loss of trade secrets, is not central to the achievement of the purpose of the statute. As in *Consolidated Cigar,* "the resulting burden on interstate commerce is clearly excessive, even in relation to the Commonwealth's strong interest in informing consumers of health risks." 218 F.3d at 56.

## CONCLUSION

For all the foregoing reasons, the plaintiffs' motions for summary judgment are GRANTED, and the defendants' motions for summary judgment are DENIED.

Mass. Gen. Laws ch. 94, § 307B violates (1) the Fifth and Fourteenth Amendments to the United States Constitution by taking trade secret property for public use with no provision for, and no reasonable prospect of, just compensation; (2) the right to procedural due process secured by the Fourteenth Amendment to the United States Constitution by failing to prescribe adequate procedures to protect the plaintiffs' interests in the confidentiality of their trade secrets, including a meaningful opportunity to be heard before any disclosure of trade secret information to the public; and (3) the Commerce Clause of Section 8 of Article I of the United States Constitution by unduly burdening interstate commerce and by impermissibly at-

---

**36.** It has been wryly suggested that the task of weighing the local benefit to public health that is the object of this statute against the probable effect on the plaintiffs' economic interests is like trying to judge whether "a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.,* 486 U.S. 888, 897, 108 S.Ct. 2218, 100 L.Ed.2d 896 (1988) (Scalia, J., concurring).

**37.** The defendants are correct that aggregate disclosures do not permit consumers to compare the ingredients in different brands and thus choose comparatively less harmful brands. But the significance of that fact is diminished by the fact that consumers already have the ability to compare brands on the basis of the most notoriously harmful aspects of every brand, such as nicotine and tar.

tempting to extend Massachusetts' regulatory authority beyond its borders.

The defendants, and their successors in office, are permanently enjoined from enforcing so much of the Disclosure Act, Mass. Gen. Laws ch. 94, § 307B, as requires manufacturers of cigarettes, snuff or chewing tobacco to disclose brand-specific information identifying constituent ingredients of their products.

It is SO ORDERED.