Jillian's Billiard Club of America, Inc. v. Beloff Billiards, Inc.

JILLIAN'S BILLIARD CLUB OF AMERICA, INC., & another[1]
vs. BELOFF BILLIARDS, INC., & others.[2]

No. 92-P-981.

Suffolk. June 3, 1993. - September 24, 1993.

Present: DREBEN. KAPLAN. & GILLERMAN. JJ.

*Unfair Competition. Trade Secret. Damages*, Wrongful use of trade secret. *Injunction. Consumer Protection Act*, Attorney's fees.

In a civil action the plaintiffs were not entitled to an award of damages where they sought only injunctive relief and attorney's fees and where there was no evidence on which to base an award of damages. [375]

In an action alleging that the defendant misappropriated trade secrets and engaged in unfair trade practices, the judge properly denied the plaintiffs injunctive relief with respect to information that did not qualify as a trade secret. [375-376]

In an action seeking injunctive relief for misappropriation of trade secrets and for unfair trade practices, the judge properly, within discretion, declined to enjoin the defendants from opening an establishment in competition with the plaintiffs'. [376-377]

Where plaintiffs in a civil action obtained injunctive relief and proved that the defendants violated G. L. c. 93A, the judge correctly awarded the plaintiffs their attorney's fees. [377]

CIVIL ACTION commenced in the Superior Court Department on February 6, 1990.

The case was heard by *Elizabeth B. Donovan*, J.

*Thomas D. Burns* (*John J. McGivney & Patricia B. Gary* with him) for the plaintiffs.

*Henry C. Dinger* for the defendants.

DREBEN, J. This action was brought by the plaintiffs seeking injunctive relief to prevent the opening of a competing billiard establishment on the grounds that the defendants

---

[1]Jillian's Billiard Club, Inc. We refer to both corporations interchangeably as Jillian's.

[2]Howard Shoer, Michael Beloff and James Singelman.

had stolen the plaintiffs' trade secrets and had engaged in unfair trade practices. At the conclusion of a jury-waived trial in Superior Court, a judgment was entered for the plaintiffs which enjoined the defendants from "using, revealing, divulging, assigning or disseminating all financial information, including accounting procedures, obtained by [the defendant Howard] Shoer from the plaintiffs," and which ordered the defendants to pay the plaintiffs' attorney's fees in the amount of $180,006.41. The plaintiffs appeal, seeking broader relief; the defendants cross-appeal, claiming the judge's finding that they misappropriated confidential financial information was clearly erroneous. We affirm the judgment.

We summarize the judge's findings which, contrary to the defendants' contention, are amply supported by the record. In late 1988, while living in New York, Shoer became interested in "upscale" billiard parlors. He knew that Jillian's was the only upscale parlor in Boston, and he visited it several times to observe its operation. Jillian's was very successful and was the subject of a number of articles in the national press. During July, 1989, Shoer located space at 361 Newbury Street, Boston, to house a billiard establishment for the defendants, Beloff and Singelman, the financial contributors to the venture. Beloff and Singelman hired an architect and a lawyer to advise on zoning and licensing issues. No lease, however, was signed, and by October 1989, the Newbury Street project was abandoned.

In addition to its Boston location, Jillian's was preparing to open a second billiard site in Miami, Florida. Seth Werner, a potential investor in Jillian's proposed club in Florida, wanted someone to perform a "due diligence" search to determine the income, expenses and profit of the plaintiffs' Boston club. After Shoer was recommended to him, Werner asked Shoer to give him the figures of the Boston operation including start-up costs. He told Shoer that confidentiality was important both to him and to Jillian's. A meeting was scheduled for November 13, 1989. Before this meeting, Shoer and the architect hired by the defendants inspected a

property located at 126 Brookline Avenue, Boston, a site around the corner from Jillian's. Both men thought this would be a good location for their billiard club. Singelman was informed, and preliminary discussions with the landlord were begun. Shoer did not inform Werner or Kevin Troy, a principal of Jillian's, of his plans to open a billiard parlor in competition with Jillian's.

On November 13, 1989, Shoer met with Troy, who provided him with all the figures he requested, including the start-up costs for Jillian's proposed Florida club and actual income and expenses for the first three quarters of 1989[3] for Jillian's in Boston. The monthly operating expenses were set forth in great detail. The revenue projections contained formulas for estimating café sales, pro shop sales, and seasonal adjustments. The figures were more detailed than those Shoer had previously prepared for the Newbury Street venture. Troy answered all of Shoer's questions but told him the information was confidential and considered by Jillian's to be proprietary.

The next day, November 14, 1989, Shoer returned to New York and met with Beloff and Singelman with whom he discussed the substance of his investigation of Jillian's. He estimated that the initial investment to open such a billiard parlor was $500,000. With renewed vigor, the defendants began pursuing the billiard club project. Shoer prepared figures for the Brookline Avenue site following the format and containing all the detail provided to him by Troy. Singelman delivered Shoer's figures to his accountant, who confirmed the figures by referring to a report he had performed for a New York billiard parlor. At about this time, Singelman made a gift of $5,000 to Shoer. The architect and lawyer were rehired, and on January 24, 1990, Beloff Billiards, Inc., obtained a license to operate a billiard parlor. It signed a lease for a location near Jillian's.

The judge found that the information provided by Shoer was the basis for the decision of Beloff and Singelman to

[3]Some figures were provided for 1988. Jillian's, Boston opened in July, 1988.

35 Mass. App. Ct. 372                                        375

Jillian's Billiard Club of America, Inc. *v.* Beloff Billiards, Inc.

open a billiard parlor in Boston. She found Shoer's conduct "reprehensible," in "bad faith," and in violation of G. L. c. 93A.

1. Although the plaintiffs now seek a remand to assess damages, see *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 169-170 (1979), they do not claim, and the record does not indicate, that they ever requested damages from the trial judge. At trial, they sought only injunctive relief and attorney's fees. Not having sought such relief below, the plaintiffs may not for the first time claim error on appeal. The judge was not required, sua sponte, to award damages.

Moreover, the plaintiffs offered no evidence at trial as to either the amount of their loss caused by the defendants' actions or of the amount of gain to the defendants in starting up the competing business. See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. at 169-171; Restatement of Unfair Competition § 45(1) (Tent. Draft No. 4, 1993). Since the defendants had as yet not opened their establishment, any projected losses of the plaintiffs would have been highly speculative. However, the value of what had been taken, or start-up costs, might have been quantifiable, and the plaintiffs had the burden to prove such amounts "with only as much certainty as is reasonable under the circumstances." Restatement of Unfair Competition § 45, comment b (Tent. Draft No. 4, 1993). See also Restatement (Second) of Torts § 912 at 478, 482-483 (1979). Absent evidence of loss or gain, the judge had no basis upon which to award monetary damages.

2. The judge ruled that the plaintiffs' financial information, including accounting procedures, qualified as a trade secret, but concluded that advertising, marketing, and information relating to the type of billiard tables and cues, parking, decor and games were not protected because such information could readily "be acquired or duplicated by an observant party." The plaintiffs claim this was error.

"The crucial issue to be determined in cases involving trade secrets . . . is whether the information sought to be protected is, in fact and in law, confidential." *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 840 (1972). Since

Jillian's Billiard Club of America, Inc. *v.* Beloff Billiards, Inc.

the information could readily be obtained by reading the advertisements[4] and visiting the billiard parlor, the judge was correct in denying injunctive relief as to these matters.

3. The plaintiffs also claim that the judge erred by not enjoining the defendants from opening and operating the billiard parlor at 126 Brookline Avenue, Boston. We see no abuse of discretion.

The scope of an injunction depends on a comparative appraisal of all of the facts of the case, and what is reasonable will depend in each instance on the particular facts. *Analogic Corp.* v. *Data Translation, Inc.*, 371 Mass. 643, 647 (1976). Restatement of Unfair Competition § 44(2) (Tent. Draft No. 4, 1993). A portion of comment c of § 44 of the Restatement is instructive here.

> "c. *Appropriateness of injunctive relief.* Injunctive relief is often appropriate in trade secret cases to insure against additional harm to the trade secret owner from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from its wrongful conduct. If the information has not become generally known, an injunction may also be appropriate to prevent destruction of the plaintiff's rights in the trade secret through a public disclosure by the defendant. If the trade secret has already entered the public domain, an injunction may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation. If the defendant retains no unfair advantage from the appropriation, an injunction against the use of information that is no longer secret can be justified only on a rationale of punishment and deterrence. However, *because of the public interest in promoting competition, punitive injunctions are ordinarily inappropriate in trade secret actions*" (emphasis supplied).

[4]The plaintiffs claim there is a difference between advertising and market strategy. However, what worked well could be seen from where and how Jillian's continued to advertise.

While the judge could, in her discretion, have given the plaintiffs injunctive relief to preclude the defendants from having a head start advantage, she was not required to do so. There was strong evidence that the success of Jillian's was known and that the defendants had been interested in opening a billiard establishment prior to Shoer's reprehensible actions. There was also evidence that the figures he appropriated were confirmed by the defendants' accountant in New York from figures for another billiard establishment. In view of the public interest in competition and the lack of evidence that the plaintiffs would suffer additional harm by the opening of a competing establishment, the judge was within her discretion in determining that an injunction limited to preventing the use of the plaintiffs' figures, including their accounting procedures, and preventing loss of their trade secrets through public disclosure, was a sufficient remedy when coupled with the prospect of awarding the plaintiffs their attorney's fees. A fortiori, the judge could well have determined that the relief sought by the plaintiffs, precluding the opening of a competing establishment, was too Draconian a remedy and against the public interest.

4. We turn to the defendants' cross appeal. As stated earlier, a review of the evidence indicates that the judge's findings are amply supported by the evidence. The defendants also claim that the judge erred in awarding attorney's fees because the plaintiffs substantially failed to prevail in their action. The plaintiffs obtained injunctive relief and were also successful in proving that the defendants violated G. L. c. 93A, § 2. The award was warranted. The violation "had some adverse effect upon the plaintiff[s], even if it [was] not quantifi[ed] in dollars." *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 718 (1989). *Alcan Aluminum Corp.* v. *Carlton Aluminum of New England, Inc.*, ante 161, 174 (1993).

*Judgment affirmed.*