INCASE, INC., Plaintiff,

v.

TIMEX CORPORATION, Defendant.

No. CIV.A. 02–40022–FDS.

United States District Court, D. Massachusetts.

Feb. 10, 2006.

228

J. Christopher Allen, Jr., Stephen M Larose, Timothy W. Mungovan, Nixon Peabody LLP, Boston, MA, for Timex Corporation, Defendant.

Stephen G. Morte, Marlborough, for Incase Incorporated, Plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CLAIM UNDER MASS. GEN. LAWS CH. 93A

SAYLOR, District Judge.

This case involves a dispute between Timex Corporation, a manufacturer of wristwatches, and Incase, Inc., a manufacturer of plastic packaging. It was tried before a jury over six days in October 2005. The jury heard three claims:

breach of contract, misappropriation of trade secrets, and implied contract/unjust enrichment. The Court reserved to itself plaintiff's claim under Mass. Gen. Laws ch. 93A, which alleged that Timex engaged in unfair and deceptive acts in the course of its business dealings regarding the design and manufacture of the packaging. The following sets forth the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 on the chapter 93A claim.

## Background

The procedural history of this case is as follows: Incase filed suit against Timex in Worcester Superior Court in 2002. The complaint alleged six counts: (1) breach of a contract to purchase watch packaging and breach of a contract to purchase heart monitor packaging; (2) conversion; (3) misappropriation of trade secrets; (4) unjust enrichment; (5) fraud and misrepresentation; and (6) unfair and deceptive trade practices under Mass. Gen. Laws. ch. 93A, § 11. The complaint sought $2,288,500 in damages on the breach of contract claims; treble damages, costs, and attorneys' fees on the chapter 93A claim; and costs, attorneys' fees, and an unspecified amount of monetary damages on the remaining claims.

Timex removed the action to this Court based on diversity of citizenship. It then filed a motion to dismiss the fraud and misrepresentation count, which was granted by the Court (Gorton, J.). Timex next moved for summary judgment as to all remaining claims. The Court (Saylor, J.) granted that motion on the breach of contract claim insofar as it involved packaging for heart rate monitors and plastic containers for wristwatches—that is, the base and cover, as opposed to the plastic wristwatch holders within those containers. The Court denied summary judgment as to the rest of the claims. Before trial, Incase voluntarily dismissed its claim for conversion.

The jury trial on the remaining claims, and the bench trial on the chapter 93A claim, commenced on October 11, 2005. The jury was instructed on Incase's breach of contract, trade secret misappropriation, and implied contract/unjust enrichment claims. It returned a verdict for Incase on each, as follows: for trade secret misappropriation, $139,191; for breach of contract for watch holders, $267,750; and for implied contract/unjust enrichment, $246,261.

Timex filed motions for judgment as a matter of law as to each of these three counts pursuant to Fed.R.Civ.P. 50 and for a new trial. The Court heard argument on December 12, 2005, and, for the reasons stated in open court, granted the motion for judgment as a matter of law with respect to the trade secret misappropriation and implied contract/unjust enrichment claims, and denied the motion with respect to the breach of contract claim. The Court also denied the motion for a new trial. Finally, the Court indicated that it intended to find for Incase on the chapter 93A claim and directed Incase's counsel to file an affidavit concerning its attorneys' fees and costs.

## Findings of Fact [1]

### The Parties and the Nature and Scope of their Relationship

■ 1. Incase is a designer and manufacturer of injection-molded plastic

---

1. The Court is not bound to find facts consistent with the jury's findings. "A judge may make independent and, therefore, different, findings on the c. 93A aspect of a case that arises from the same facts which gave rise to parallel common law claims." *Poly v. Moylan*, 423 Mass. 141, 151, 667 N.E.2d 250 (1996) (internal brackets omitted) (citing *Wyl-*

packaging products located in Hopedale, Massachusetts. Transcript ("Tr.")[2] 1:30, 47, 53, 63; Tr. 3:30.

2. Timex, through its affiliate, manufactures watches and other electronic and consumer goods. It has corporate offices in Middlebury, Connecticut, and distribution operations in Shelton, Connecticut. *See, e.g.,* Answer ¶ 4; Tr. 3:120–21; Tr. 4:82; Exhibit ("Ex.") 8.

3. The parties first met in late 1997, and then had a series of meetings in January 1998 to discuss the possibility of a business relationship. During these meetings Timex described its wristwatch packaging needs and design challenges, and Incase proposed ideas to address those issues. *See, e.g.,* Tr. 1:30, 32–33; Tr. 3:132–34.

4. Timex's primary packaging for watches at that time was what was called the general holder, or the "G–3." The G–3 comprised a plastic base on which a "C" shaped plastic holder[3] stood on a display stand. Attached was a small piece of plastic, on which a price tag could be placed, that swivelled into two positions. This was known as a "price flag."[4] A wristwatch could be placed on the holder to be displayed to retail customers. Tr. 1:31–32; Tr. 3:9; Ex. 131.

5. In addition to its plastics manufacturing capabilities, Incase also performs design work for its clients. The design work is ancillary to Incase's manufacturing business and is intended to support its efforts to sell plastic-molded products to the client. While it does not charge separately for its design work, Incase expects that if the client wishes to use the design Incase will retain the rights to manufacture the product. *See, e.g.,* Tr. 1:47–48; Tr. 2:77.

6. From January 1998 until approximately June 1999, Timex repeatedly solicited Incase to help it solve various packaging challenges. *See generally* testimony of Zanghi, Gursky, and Shelton; Exs. 1, 2, 6, 45. Incase responded by attempting to design packaging products that Timex would want to use so that Timex would then contract with it to manufacture the products.

7. During this time, the parties met approximately every two weeks to discuss various packaging designs that Incase was developing for it and how well they met Timex's needs. *See, e.g.,* Tr. 3:25–26; Tr. 2:37, 42; Exs. 21, 26, 45.

8. Participating in these meetings for Timex were Richard Gursky, a packaging engineer responsible for worldwide packaging design, and usually Gerry DiMarco, the person responsible for packaging design needs from the point of view of sales, marketing, and distribution. Tr. 3:21, 49, 59; Tr. 4:27–28. At times Berit Watson, a

---

er v. Bonnell Motors, Inc., 35 Mass.App.Ct. 563, 567, 624 N.E.2d 116 (1993)); *accord Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1063–67 (1st Cir. 1985).

**2.** Transcript references contain a first number indicating the day of testimony (from the first to the sixth day), followed by a colon and a number indicating the specific page(s) of that transcript on which the referenced testimony can be found.

**3.** Throughout the trial, the parties also used the terms "collar" and "C" to refer to the holder. *E.g.,* Tr. 1:52–53; Tr. 3:125–26.

**4.** The parties also used the term "price clip" or "clip" to refer to the price flag. *E.g.* Tr.1 80–81; Tr. 3:88–89.

Timex purchasing agent, was also present. Tr. 4:27, 82.

9. Participating in these meetings for Incase were Frank Zanghi, its Vice President, and generally Bob Shelton, its head designer, and Walter Frick, its President. *See generally* testimony of Zanghi, Shelton, and Gursky.

10. Throughout the relationship with Timex, Incase provided design services without charge. Mr. Zanghi, however, explained to Mr. Gursky and Mr. DiMarco that Incase expected that if Timex liked the designs and wanted to use them, it would contract with Incase to manufacture the product. *E.g.*, Tr. 3:30. Although Timex representatives understood that this was Incase's expectation, no formal agreement to that effect was ever entered into by the parties.

11. During the course of their relationship, Incase worked on a number of packaging concepts for Timex. Two are particularly relevant to the chapter 93A claim: first, the development and manufacture of a "security package" for Timex's sport watch program, which became known as the "S–4" package; and second, the development of a "universal" removable and adjustable price flag to fit a holder that could be used for all of Timex's watches. This latter concept was sometimes referred to as the development of the "next generation" general holder, or the development of the G–4 holder. Mr. Gursky and others at Timex contemplated that if the design proved successful, it would largely or completely displace the G–3 general holder.

### The Development and Manufacture of the S–4 Holder

12. Beginning in January 1998, the parties began negotiating the development and purchase of a package for Timex's sport watch program. *E.g.*, Tr. 1:49; Tr. 3:71–72.

13. Timex wanted a "security" or "self-service" package so that customers could handle the package without the need for a sales clerk to remove the package from a display case. Tr. 3:130–31.

14. Between January and May 1998, Incase designed such a package, which the parties referred to as the "S–4" package. Tr. 1:49. The packaged consisted of a black, square plastic base; a "C" shaped plastic watch holder and display stand on which a wristwatch could be displayed; and a clear plastic box that covered the holder and was attached to the base. *E.g.*, Tr. 2:56; Ex. 80; Ex. 143.

15. A small plastic price flag was affixed to the rear of the watch holder in the S–4 package. The purpose of the price flag was to permit labels with pricing information to be applied to the flag during Timex's automated labeling process. The price flag on the S–4 collar was stationary and could not be moved or removed. *E.g.*, Tr. 1:79–80; Tr. 4:58.

16. By May 1998, the S–4 design was basically complete. Timex approved the concept, and expressed a desire to have the injection molds and other tooling created so that Incase could start manufacturing the S–4 package. Tr. 1:48–49; Tr. 2:89–90.

17. Incase does not create tooling for its products. Instead, it engages outside contractors to create such tooling. *See* Tr. 1:46–47, 53–54.

18. Around this time, Incase and Timex agreed that the tooling expenses for the S–4 package would be passed through to Timex. However, Mr. Di-

Marco asked that Incase pay the tooling costs up front, with Timex reimbursing it the following year. Mr. Zanghi stated that he would not agree to pay for the tooling up front unless Timex committed to purchasing a certain number of manufactured units. Tr. 1:49–51; Tr. 3:73–74.

19. Accordingly, the parties met at Incase's facility in Hopedale in May 1998 to discuss an agreement as to a production number. Tr. 1:53.

20. Incase and Timex reached an oral agreement during the parties' meeting in May 1998 to conclude a contract for S–4 watch holders,[5] on which the parties shook hands. *E.g.*, Tr. 1:53–54; Tr. 5:12; *see also* Tr. 4:33.

21. The parties had agreed to at least the following terms by the conclusion of the May 1998 meeting:

(a) Incase would manufacture two million S–4 watch holders per year for three years. Tr. 1:53; Tr. 4:83–85; *see also* Exs. 8, 102.

(b) Incase would pay for the tooling of the holders up front, with Timex reimbursing it in the following year. Tr. 1:49–52; Tr. 4:35–36; Tr. 5:10.

(c) Timex would follow up with a purchase order to Incase for the tooling for the holder, and the six million units that Timex had committed to buy. Tr. 1:55; *see also* Ex. 8.

22. With respect to the cost of the tooling, the parties either agreed that the cost to Timex of the tooling for the holders would not exceed $133,000, or that the parties would negotiate towards an agreement on that cost. *See e.g.*, Tr. 2:88; Tr. 3:74–77; Ex. 8. For these purposes, the Court need not resolve the issue.

23. With respect to the price of the units, the parties agreed that the price of the holders per unit was $0.1100 for large units and $0.1075 for small units. The parties agreed, however, that the purchase was contingent upon Incase's prices remaining competitive. Tr. 5:90–92; Ex. 8. If Incase's price was not competitive, Timex could purchase the units from a competitor so long as it first notified Incase and gave it the opportunity to price its units competitively. Tr. 5:90–92. The parties also agreed that the price could be adjusted as necessary to meet future changes.

24. The parties' subsequent course of dealings reflected this agreement. For example, when Timex later wanted to change the material from polystyrene to a more expensive "Denka" plastic, the parties understood that the price of the units would adjust accordingly, and Incase did make the adjustment. Tr. 2:37; Ex. 21. Timex also asked Incase to work toward making the S–4 package lighter in weight and adding logos to it; although this change was never made, the parties expected that the price would change if these design modifications were implemented. Tr. 2:42; Exs. 26, 45.

**5.** As stated above, the Court granted, in part, Timex's motion for summary judgment insofar as Incase's contract claim included a contract for plastic containers for wristwatches—the box base and cover—leaving only the portion of the contract claim concerning the holders for trial. However, for background purposes, Incase was allowed to present evidence relating to its work on and the composition of the entire S–4 package—not just the S–4 holder. *E.g.*, Tr. 1:37–38. The Court did not allow Incase to argue from such testimony that a contract for the entire package, or other sub-parts of the package, was formed. *E.g.*, Tr. 1:36. The jury charge on the contract claim related only to S–4 holders.

25. Timex paid approximately 12.4 cents for holders during part of the term of the contract. Tr. 5:119. By 2000, Timex was paying as much as 14.75 cents for holders under the contract. *See* Exs. 86, 149. Timex never told Incase that it was not pricing S–4 holders competitively. Tr. 5:92.

26. On July 6, 1998, Timex faxed a purchase order to Incase. The purchase order stated in part as follows: Timex will purchase six million holders between January 1, 1999 and December 31, 2000. However, this purchase is contingent upon Incase remaining competitive with the industry. The current piece prices are as follows: Large $0.1100, Small $0.1075. Ex. 8.

27. The purchase order used the term "holders," rather than "packages." As described above, in this context, a "holder" is part of the entire package; an S–4 package is made up of a base, a holder, and a cover.

28. Also included on the purchase order were the following specifications: The concept, design, and tooling for the holders are the property of Timex. The first 50% of tooling costs is due the first quarter of 1999 and the remaining 50% is due the second quarter of 1999.

Injection molding tool for the large watch holder (990—92896) and the small watch holder (990—092897). Tooling cost not to exceed $133,000. Ex. 8.

29. Although the purchase order was faxed on July 6, the "date of order" was described as May 4, 1998. The total price of the purchase order was $133,000. The "delivery date" on the order was September 1, 1998. The purchase order was numbered 63480 and signed by Berit Watson on behalf of Timex. Ex. 8.

30. Mr. Zanghi understood as of the May 1998 meeting that he needed to have a purchase order or other documentation signed by Timex in order to have a binding contract. Tr. 2:85. However, he understood that an oral agreement had been reached at the meeting and that Timex had agreed that a purchase order would follow. Tr. 2:84–86.

31. Incase engaged a tool and die manufacturer in Michigan to create the tooling used for the S–4 package. *See* Tr. 1:54; Tr. 2:32.

32. Changes to the tooling costs occurred after Timex sent its first purchase order. Ex. 8. Timex initiated these changes. Tr. 1:60; Tr. 2:30, 103. One of these changes reflected a decision by Timex to have the S–4 package designed so that it could be manufactured in two ways: with a stationary price flag, and without a price flag. Tr. 2:103–104.

33. The cavitation of the tooling—that is, the number of cavities in which a plastic part can be molded—determines how many units can be produced in a given period of time. Tr. 1:51, 62. Timex requested that Incase procure tooling for the S–4 package with sufficient cavitation to produce approximately 3 million units per year. Tr. 1:62.

34. The parties did, in fact, negotiate, and ultimately agree, that the cost of the tooling for the holders would be $126,000. Incase also procured tooling to manufacture the entire S–4 package, including the box base and cover, as well as spare cavitation. Therefore, the final tooling costs for the entire S–4 package was $402,100,

which included the $126,000 for the tooling for the holder. This did not include a $27,000 contribution that Incase agreed to make toward the total cost. The tooling for the S–4 package was completed in early October 1998, and likely in transit to Incase's facility by the time that Timex sent the final purchase order for the tooling, Exhibit 16. Tr. 2:31, 33–34, 90, 96–97; Tr.3:76–78; Tr. 4:36; Exs. 15, 16.

35. On October 26, 1998, Ms. Watson faxed another Timex purchase order to Incase. On the fax cover page, Ms. Watson typed the following note to Mr. Zanghi:

I have been informed that this is the final, approved purchase order.

If there are any issues, please let me know right away.

It has been a pleasure working with you so far!!

Ex. 16.

36. Prior to having Ms. Watson send this purchase order to Incase, Mr. Gursky asked Ms. Watson to change the quantity in the purchase order from six million to two million units. Ms. Watson did not think it was right to change the number. She had been at a number of the meetings with Incase and had discussed the matter both with Mr. Gursky and Mr. DiMarco, and she understood that the deal was for six million units over three years. Tr. 4:83–84, 88. She nonetheless changed the number from six million to two million at Mr. Gursky's request. Tr. 4:88.

37. The first page of the revised purchase order states as follows:

Timex will purchase two million holders between January 1, 1999 and December 31, 2001. However, this purchase is contingent upon Incase remaining competitive within the industry. The current piece prices area as follows: Large $0.1100, Small $0.1075.

Ex. 16.

38. Incase never countersigned the October 1998 purchase order.

39. Incase expected that Timex would order S–4 units at a rate of approximately 200,000 per month. Tr. 2:59. This expectation was reasonable, based on the promise of two million holders per year and the manufacturing capacity of the tooling given the cavitation that Timex ordered.

40. At orders of quantities much smaller than approximately 200,000 units per month, Incase incurred additional costs associated with the smaller material purchases and did not achieve the economies of scale that it expected on its manufacturing costs. Tr. 5:26–27.

41. Timex's orders for the S–4 package began dropping off sometime in late 1999. Tr. 2:53.

42. Timex ordered and paid for approximately 300,000 S–4 packages from Incase from October to December 1998 and 1,500,000 in 1999. From January to August 2000, Timex ordered and paid for only 375,000 S–4 packages. Tr. 2:59; Ex. 86.

43. Ultimately, Incase shipped, and Timex accepted and paid for, 2,731,500 S–4 watch packages. Tr. 5:40. Therefore, 3,268,500 holders remained unfulfilled under the contract.

### The Design of the Next Generation General Holder

44. As early as January 1998, Timex discussed with Incase changes that it wanted made to its general holder. At that time, Timex's general holder, the G–3, included a price flag that

swivelled into two positions. Mr. Gursky told Incase that Timex had a need for a large volume of general holders, roughly 20–25 million per year. *E.g.,* Tr. 1:46; Tr. 3:52–56; Exs. 1, 2, 131.

45. Mr. Gursky told Incase that if Incase could design a new price flag and watch holder that would work for all of Timex's applications, Incase could possibly become the supplier for Timex's "next generation" general holder. *See, e.g.,* Tr. 1:45; Tr. 3:17, 53–56.

46. Mr. Zanghi believed that if Incase could develop a design that Timex liked and wanted to use as its "next generation" general holder, Incase would be granted the rights to manufacture it. Tr. 3:28–30

47. Incase began creating drawings and prototypes for concepts that were a part of the "next generation" general holder as early as January 1998. By May 1998 or so, the project was full blown. *See, e.g.,* Tr. 1:75–78; Tr. 3:26–27; Tr. 4:10; Ex. 2.

48. The parties referred to the "next generation" general holder concept as the "G–4" and the "G3/S4 universal" design. *E.g.,* Tr. 2:51. Incase called its final design the "Universal C–Clip." *E.g.,* Tr. 2:60–63; Ex. 97. (For convenience, the Court will refer to Incase's design on this project, which developed and changed over time, as the "Universal" design).

49. To establish the parameters of the project, Timex provided Incase with certain specifications for the design; these specifications derived from Timex's marketing and automation needs. Mr. Gursky of Timex also supplied various concepts and ideas to Incase. *E.g.,* Tr. 3:9, 12–13; 15, 20–22; Tr. 4:20–21.

50. Incase designed numerous versions of the "Universal" design, including new price flag and holder prototypes, and created numerous drawings. It provided these items to Timex, which then provided its feedback. After receiving input from Mr. Gursky as to how well those designs met Timex's needs, Incase modified the designs and resubmitted them for Timex's comments and approval. *See, e.g.,* Tr. 3:114; Tr. 4:108–109. Incase made dozens of modifications to the "Universal" design as a result of this process. Tr. 3:25.

51. As a part of that process, Incase worked on modifying the S–4 watch holder design so that it would work for each of the five or six different Timex packaging applications. Incase also worked on integrating a removable price flag into the S–4 design. Tr. 3:15, 53–55, 136, 142–43; Ex. 45.

52. The parties continued to work on the concept of a "Universal" design, and by November 1998, the parties' discussions regarding Incase becoming the "next generation" general holder supplier had become "serious." Tr. 3:141.

53. By December 1998, Incase had developed a "Universal" design for a movable, three-position price flag. At the same time, it submitted a cost summary to Incase detailing the cost of the tooling to manufacture the product. Tr. 2:36, 39–41; Exs. 18, 19, 24, 51, 52.

54. This process ultimately resulted in a final design of a new price flag and holder that appeared to meet Timex's needs. This final "Universal" design was complete in May or June 1999. *E.g.,* Tr. 3:26.

55. Over the approximate 18–month period during which Incase worked on the "Universal" design, it expended

significant resources the project, as follows:

(a) It developed at least 20 prototypes and created numerous drawings Ex. 79; Tr. 2:36; Tr. 3:13.

(b) It procured tooling for the purpose of testing one of the prototypes. Ex 147; Tr. 3:46–47.

(c) It proposed a number of budgets to Timex for the manufacture of the product. Exs. 3, 4, 12, 14, 18, 19, 51, 52; Tr. 2:27, 30–31, 44–45. These budgets reflected production numbers ranging up to tens of millions of units.

(d) Incase employees attended numerous meetings—at least some of which were described as "marathon" meetings that began early in the morning and ended late at night—and communicated with Timex officials on a regular basis to discuss the project. Exs. 45, 75; Tr. 2:33; Tr. 4:15.

56. The final design for the price flag for the "Universal" holder included a three-position "L shape" removable plastic flag with slots so that it could slide into three different positions on the holder. It was designed so that it would work with Timex's automated pricing system so that the stock keeping unit ("SKU") and price information could be affixed to the flag automatically. It was also designed so that Timex could use just one watch holder for all of its watches. The price flag was comprised of just one plastic piece. Tr. 2:51; Tr. 3:15–16, 26; see Ex. 144.

57. Timex and Incase never entered into a contract for manufacturing any product using the three-position price flag or any other aspect of the "Universal" design, nor did Timex ever place any order for such a product.

58. The three-position price flag was not patented by Incase. Nor did Incase take the necessary steps to protect its design as a trade secret. For example, although Mr. Zanghi testified that he regarded the designs as confidential between Incase and Timex, Incase did not mark any of its documents concerning the design as confidential. Tr. 2:55; Tr. 3:33–34. Mr. Zanghi testified that he did not share the "Universal" design with other companies. Tr. 2:55. But other than that minor restriction, there was no evidence that the "Universal" design was the subject of any precautions to preserve its secrecy or limit its distribution. Further Mr. Shelton, Incase's head designer, testified that he did not regard the "Universal" design as secret. Tr. 4:124.

59. Unknown to Incase, by August 1999, Timex was engaging in discussions with a company in the Philippines called Yuhing regarding the production of an "S–5" watch holder package. Tr. 3:102–103; Exs. 55, 56; 64. Timex initially referred to the S–5 package as an "S–4 revision." Exs. 55, 56, 64. Mr. Gursky was a part of these discussions.

60. Timex decided to give the S–5 manufacturing work to Yuhing. It is not clear when precisely Timex made this decision. However, it was in detailed technical discussions with Yuhing regarding the S–5 mold build by, at the latest, August 1999.

61. Incase was not made aware that Timex had decided to give the S–5 manufacturing work to Yuhing. Tr. 2:47; Ex. 55, 56, 64. Mr. Zanghi testified that as late as August 1999, Incase was still working with Timex on prototypes and designs related to

the "Universal" design. Tr. 2:49–50; Tr. 3:102–105; Ex. 64.

62. The S–5 holder was based in substantial part on Incase's design and development work. Tr. 2:51; Tr. 3:143; Exs. 43, 79, 144.

63. Mr. Gursky used dimensions from Incase's mold drawings and prototypes in order to have drawings made for the S–5 holder and price flag. Tr. 3:90; Tr. 4:8–9; Ex. 22 (revision dated June 4, 1999).

64. The differences between Incase's "Universal" design and the S–5 holder were relatively minor. The S–5 package had a four-position price flag while Incase's design was for a three-position flag. Tr. 3:53. The S–5 price flag had a 45–degree angulation. Tr. 2:51–52; Tr. 3:55, 60; Tr. 4:109. The S–5 package may also have been a little bit lighter in weight. Tr. 2:72.

65. Mr. Gursky and others at Timex had substantial input into the "Universal" design—in fact, Timex had used a movable price flag on its G–3 holder. But the price flag design that was ultimately used by Timex on its S–5 holder was substantially different from the G–3 design, and was developed, at least in substantial part, by Incase. *See* Tr. 3:12–13, 24, 26; Tr. 4:109–110, 117–119.

66. The S–4 and the S–5 packages served the same purpose, and were fungible products from a marketing perspective. *See, e.g.,* Tr. 2:72; Tr. 3:52–53, Tr. 4:101–102; Ex. 112.

67. By May 2000, Yuhing had begun shipping S–5 packages to Timex. Ex. 118.

68. Approximately a year later, Yuhing was shipping S–5 packages at a rate of 15,000 per day. Ex. 112.

69. By August 2001, Timex needed more S–5 packages than Yuhing could produce. Timex ordered S–4 packages from Incase in an attempt to satisfy the shortfall. Tr. 2:72; Tr. 4:101–102; Ex. 111. Timex therefore viewed the S–4 package as a substitute for the S–5 package for at least some purposes.

70. Mr. Gursky did not agree with Timex's decision to move the manufacturing from Incase to a supplier overseas. Tr. 3:109. Mr. Gursky felt that his job would be in jeopardy if he openly disagreed with a corporate decision of Timex. *See* Tr. 3:109–110.

71. Mr. Gursky testified that he believed that Timex would have to use Incase to manufacture the product if it took Incase's design, or at least pay for the design before using it. *E.g.,* Tr. 3:57. Timex knew this before it engaged Yuhing to manufacture the S–5 package with the design developed in substantial part by Incase.

72. Timex offered to pay Incase for the "Universal" design, but Incase refused payment. According to Mr. Frick, the company did not do business that way. *E.g.,* Tr. 5:17.

73. Timex claims that it paid Incase for the "Universal" design. Mr. Gursky testified that he believed that Timex paid $5,000 for the design through a purchase order numbered 95440. Ex. 49; Tr. 3:57–58. Mr. DiMarco, on the other hand, testified that he believed that Timex paid $2,500 for the mold for the price flag that Incase developed through a Timex purchase order numbered 65910. Tr. 4:60–63, Tr. 6:114–115; Exs. 146, 147. However, these purchase orders do not purport to relate to the "Universal" design. Exhibit 49 purports to relate to an "S4 box cover cavity." Exhibit 146 purports to relate to the "prototype mold to manufacture security ring."

Mr. Zanghi testified that neither of these purchase orders had anything to do with the price flag Incase developed. Tr. 2:43–44; Tr. 6:117–18. No Timex purchase order purports to purchase the "Universal" design. Although Exhibit 147 included a letter quoting a price for the "C–Clip Prototype" at $2,500, the Incase invoice attached to that letter stated that the $2,500 was for the "tooling charge for prototype." According to Mr. Zanghi, this was for the procurement of the tooling, not for the "Universal" design. Tr. 3:45–48. Mr. Zanghi clearly testified that Incase was never paid for its "Universal" design. Tr. 2:44. The Court finds Timex's explanation inconsistent and unclear, and credits Mr. Zanghi's testimony in this regard.

74. Incase would not have granted Timex the rights to manufacture the "Universal" design's price flag separately from the holder in which it fit. Tr. 2:77.

75. Incase presented its designs informally. Incase gave Timex "Universal" design prototypes, which Timex did not return. Tr. 2:54–55.

76. Incase never asserted that it had a contract with Timex to manufacture the "Universal" design. The parties never formed such a contract. However, Incase told Timex that it expected to have the manufacturing rights if Timex decided to use its designs. *E.g.*, Tr. 3:30.

77. Incase first discovered that Timex was using the "Universal" design when Mr. Zanghi saw a Timex package incorporating the design when he was shopping in a Target store in approximately March 2001. Tr. 2:60. He then initiated a meeting with Timex officials to relate his concern that Timex was using the "Universal" design without authorization. Exs. 97, 100.

78. Timex purchased a total of 3,569,-000 S–5 packages from Yuhing. Ex. 118. At least 2,848,000 of those were manufactured in 2000 and 2001.

### CONCLUSIONS OF LAW

#### A. Whether Timex Violated Chapter 93A

■ Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a); *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir.2000). For a claim brought by a business plaintiff, § 11 authorizes private suit only where the plaintiff suffers "any loss of money or property, real or personal" as a result.[6] Mass. Gen. Laws ch. 93A, § 11.

As a threshold matter, the parties do not dispute that the dealings between Incase and Timex occurred in the conduct of trade or commerce. The transactions at

6. Section 11 also states that "[n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged ... unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." It goes on to state that the burden is on the party seeking to establish that the challenged conduct did not occur primarily and substantially in Massachusetts. *Id.* Therefore, establishing the location of the alleged unfair or deceptive conduct is not a jurisdictional prerequisite, but a defense to liability on which the defendant bears the burden of proof. *See Clinton Hospital Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1263 (1st Cir.1990); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 979 F.Supp. 919, 925–26 (D.Mass.1997). The defense was not raised or proved; therefore, the Court need not determine the location of the challenged conduct.

issue in this case center around the sale of goods and attendant design services. *See* Mass. Gen. Laws ch. 93A, § 1(b).

### 1. *Whether Timex Engaged in Unfair or Deceptive Conduct*

Whether conduct is unfair or deceptive is a question of fact that focuses on "the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors." *Commercial Union Ins.*, 217 F.3d at 40. Incase's principal argument under chapter 93A is two-fold: it asserts that Timex engaged in unfair or deceptive acts because (1) it never intended to honor its contractual obligations to purchase six million holders and (2) it enticed Incase to develop and disclose to it the "Universal" design, which Incase claims is a trade secret, by holding out the possibility of Incase winning the contract to become Timex's "next generation" general holder supplier.

■ Although each case requires an individualized inquiry, some common themes have emerged from the case law. Two are potentially relevant here. The first is that a party who breaches a contract in deliberate attempt to obtain the benefits of the contract, and to avoid fulfilling its own obligations under it, may have committed an unfair or deceptive act under chapter 93A. *See, e.g., id.*, at 40–41 (violation where reinsurer's "pattern of evasiveness and obstructionism" to avoid its contractual obligations included deliberately avoiding coming to a decision on whether to pay; constantly shifting its defenses and objections to payment; and allowing almost two and one-half years to elapse from receipt of proof of the reinsurance until trial); *Ecological Fibers, Inc. v. Kappa Graphic Bd. B.V.*, 345 F.Supp.2d 13, 15–16 (D.Mass.2004) (plaintiff stated 93A claim where defendant entered into an agreement and never intended to carry out the terms of the agreement for the full five-year term, but rather entered into it for the purpose of obtaining information about and soliciting plaintiff's customers); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475, 583 N.E.2d 806 (1991) (violation where owner withheld approval of development plan in an attempt to force developer to increase compensation to owner beyond what contract required); *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857–59, 501 N.E.2d 1163 (1986) (violation where employee of company made a false report of the performance of a consultant with whom the company had a contractual relationship in the hopes of terminating the contract and advancing the employee's own interests at the company). The chapter 93A violation in this line of cases generally involves the use of the breach of contract as a lever or wedge to enhance a party's bargaining power or exact control over other party. *See Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985). Put another way, these cases involve "commercial extortion or a similar degree of culpable conduct." *Commercial Union Ins.*, 217 F.3d at 40 (citing *Anthony's Pier Four*, 411 Mass. at 474–75, 583 N.E.2d 806). On the other hand, "a mere breach of contract," without more, does not constitute an unfair or deceptive act or practice. *Commercial Union Ins.*, 217 F.3d at 40; *see Stonehill College v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 582, 808 N.E.2d 205 (2004) (dictum) (describing category of cases "based on a breach of contract, with some egregious circumstance surrounding that breach providing the further ingredient of 'unfairness' to make out a G.L. c. 93A claim").

The second potentially relevant line of case law is that the misappropriation of

the intellectual property of another to obtain a competitive or other advantage may also be an unfair or deceptive act. *See, e.g., Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 229, 238, 242–43 (1st Cir.2005) (jury could find that defendant violated chapter 93A by disclosing plaintiff's confidential information to a third party—which the plaintiff alleged constituted trade secret misappropriation and breach of a non-disclosure agreement—in an attempt to do business with the third party); *Jillian's Billiard Club of America v. Beloff Billiards, Inc.,* 35 Mass.App.Ct. 372, 377, 619 N.E.2d 635 (defendant violated chapter 93A by using trade secret consisting of plaintiff's financial information to establish competing billiard parlor).

As to Incase's first argument, it is true that Timex breached the contract to purchase six million S–4 holders. But it is not at all clear that it "never" intended to see the contract through to the end, as Incase alleges. Nor is it clear that Timex breached the contract *to obtain* the advantage of the contract without fulfilling its obligations. There was no evidence, for example, that Timex ordered S–4 packages and then refused to pay for them in bad faith. Rather, Timex simply stopped ordering S–4 packages. It did not refuse to pay for those that it had already ordered.

■ As to the second, it is not true that Timex misappropriated any trade secrets belonging to Incase. Because of Incase's inadequate steps to protect the secrecy of its design, among other reasons, the Court entered judgment as a matter of law for Timex on the trade secret claim. A chapter 93A claim cannot succeed merely upon the unauthorized use, disclosure, or infringement of information developed by one party where that information does not rise to the level of protected intellectual property. Put simply, chapter 93A does not create new intellectual property rights. *See Skinder–Strauss Assoc. v. Massachusetts Continuing Legal Educ., Inc.,* 914 F.Supp. 665, 680 (D.Mass.1995) (where the information that plaintiff alleged that defendant used in publishing its competing legal directory were non-copyrightable facts, plaintiff's chapter 93A claim on this basis must fail because plaintiff could not "achieve through ch. 93A what it [could not] through the federal copyright laws—gaining a monopoly on the publication of certain factual information and insulating its work from competitors as a potential source of information"). Intellectual property law—including the laws concerning patents, trademarks, copyright, and trade secrets—has developed painstakingly over the centuries, with careful attention to the difficult balance between the competing values of free dissemination of ideas and protection of the rights of inventors and other creators. *See I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 35 (1st Cir.1998) (quoting *DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir.1992)) (assessing the purposes of trademark protection and stating, generally, that the different laws protecting intellectual property "balance the conflicting interests in protection and dissemination differently in different contexts through specific rules that determine just who will receive protection, of just what kind, under what circumstances and for how long"). A party cannot be permitted to achieve intellectual property rights through chapter 93A that it could not achieve by more traditional means.

■ Thus, neither a simple claim for breach of contract nor a claim for misappropriation of unprotected intellectual property, standing alone, can support a claim for violation of chapter 93A. In this case, however, the whole is greater than the sum of its parts. Through a unique

set of circumstances, Timex was able to obtain design services for free, which it used to obtain a lower-cost contract from another supplier, which then led directly to the breach of contract with Incase. Under these circumstances, Timex's acts were unfair and deceptive within the meaning of chapter 93A.

That finding is based on the precise facts and circumstances of the case. As described above, Timex engaged Incase to design and manufacture the S–4 package. In 1998 it entered into an enforceable contract to purchase six million S–4 units: two million per year over three years. Incase began manufacturing S–4 units for Timex at the end of 1998. At the same time as the S–4 program was being developed and then launched, Timex asked Incase to design the next generation general holder. Timex communicated to Incase, in substance, that if it could develop a holder that would hold all of Timex's watches, and develop a price flag that could be removable and fit into three different positions, Timex was likely to reward Incase with a contract to manufacture as many as 25 million per year.

Incase pursued this opportunity by conducting extensive design work, and expending substantial resources, over a period of roughly 18 months. Timex strongly encouraged Incase's efforts. Although Timex offered to pay for the design services, Incase made it clear that it did not seek to be compensated for its design work, but expected to have the manufacturing rights if it developed a design that Timex wished to use.

A design that met Timex's needs was substantially completed in May or June 1999. Timex then took the design and gave it to Yuhing, a lower-cost manufacturer, effectively asserting ownership over the design. The evidence does not clearly establish when Timex decided to use Yuh-ing to manufacture the S–5 package; by August 1999, the manufacture of the S–5 tools was well underway, and Timex began purchasing S–5 packages from Yuhing in the first half of 2000. Timex never told Incase of that decision; indeed, Incase did not learn of it until after Mr. Zanghi discovered a variation on Incase's design on a shelf at a Target store. In fact, Incase may have continued to work on the "Universal" design after Timex made the decision to go with Yuhing.

Those actions, in turn, either caused or substantially contributed to Timex's decision to breach its contract with Incase for S–4 holders. The S–5 package was, in effect, a substitute for the S–4. It does not appear to have been a coincidence that Timex procured 2,848,000 S–5 units from Yuhing during 2000 and 2001, while at the same time falling 3,268,500 units short of its contractual obligations for S–4 units; the creation of the S–5 largely eliminated demand for the S–4.

As noted, there is no evidence that Timex expressly promised that it would select Incase to manufacture its next generation holder. Nor is there evidence that Incase took steps to protect its design as a trade secret. Nonetheless, it was unfair or deceptive for Timex to engage Incase to develop a design by holding out the promise of a lucrative manufacturing deal; for Timex to then use that information to have an Incase competitor manufacture a similar product, which Timex could presumably obtain for lower cost because it did not have to pay the competitor to develop the design; and for Timex to then breach its contract with Incase for the original product based on a lack of demand. Those actions had the "degree of culpable conduct" required to prove a violation of Chapter 93A. *See Commercial Union Ins.,*

217 F.3d at 40.[7]

### 2. Whether Incase Suffered a Loss of Money or Property

As mentioned above, a business plaintiff proceeding under § 11 has the burden of showing that it suffered "any loss of money or property, real or personal" as a result of the unfair or deceptive act. Mass. Gen. Laws ch. 93A, § 11. The First Circuit has stated that " '[m]oney' means money, not time, and ... 'property' means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to peace of mind, or to personal liberty." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir.1998). As described above, the unfair or deceptive act in this case was Timex's breach of the contract to purchase S–4 holders while procuring at least some substitutes from a competitor with information that Incase developed in response to Timex's solicitations. Therefore, Incase has proved that it suffered a loss of money.

### B. Incase's Damages, Attorney's Fees, and Costs

#### 1. Damages

■■ Incase is entitled to recover its actual damages caused by Timex's unfair and deceptive act. Mass. Gen. Laws ch. 93A, § 11. Here, Incase's actual damages are the lost profits on the S–4 holders that Timex would have purchased from Incase had it not procured substitutes from Yuhing, plus any costs incurred by Incase in connection with development of the "Universal" design after the time that Timex knew it was highly unlikely that it would award the S–5 work to Incase. As to the former, any amount of lost profit would be duplicative of the recovery on Incase's contract claim. *See, e.g., Grand Pacific Finance Corp. v. Brauer*, 57 Mass.App.Ct. 407, 422 n. 10, 783 N.E.2d 849 (2003). As to the latter, no evidence was presented at the trial. Indeed, no evidence was presented of the development costs Incase incurred in connection with its work on the "Universal" design, let alone the portion of these costs that were incurred after Timex knew it was highly unlikely that it would not award the work to Incase. Therefore, any amount of damages would be speculative and not grounded in the evidence.

■ If the violation is knowing or willful, Incase may recover at least two but no more than three times such damages. Mass. Gen. Laws ch. 93A, § 11. Although the Court has found a violation, it does not find that Timex's conduct was knowing or willful within the meaning of the statute. *Cf. Anthony's Pier Four*, 411 Mass. at 475, 583 N.E.2d 806.

#### 2. Attorney's Fees and Costs

■ Because it proved that Timex engaged in unfair or deceptive conduct under § 93A, Incase is entitled to its "reasonable attorneys' fees and costs incurred" in connection with its action. Mass. Gen. Laws ch. 93A, § 11. "What constitutes a reasonable fee is a question that is committed to the sound discretion of the judge." *Berman v. Linnane*, 434 Mass. 301, 302–03, 748 N.E.2d 466 (2001). In determining a reasonable award, a court is to consider: (1) the nature of the case and the issues; (2) the required time spent; (3) the amount of damages; (4) the result; (5) the attorney's experience, reputation, and ability; (6) the usual price charged for similar

---

**7.** The Court emphasizes, however, that its finding is not based solely or even substantially on Timex's mere *use* of the design that Incase developed. That design was not protected by the law of patent, copyright, trademark, or trade secrets, and chapter 93A does not create new intellectual property rights beyond those traditional areas.

services by other attorneys of the same area; and (7) the amount of awards in similar cases. *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 429–30, 837 N.E.2d 1121 (2005) (citing *Linthicum v. Archambault*, 379 Mass. 381, 388–89, 398 N.E.2d 482 (1979)). "No one factor is determinative, and a factor-by-factor analysis, although helpful, is not required." *Berman*, 434 Mass. at 303, 748 N.E.2d 466.

### a. *Attorney's Fees*

Plaintiff's submission in support of its fee request suffers from insufficient detail, including a dearth of itemized time records.[8] Detailed time records—with the individual task performed, the time spent, and the date on which the task was accomplished—would have given the Court more information to evaluate the reasonableness of "the hours spent on particular aspects of the case or the precise nature of the

work." *Twin Fires*, 445 Mass. at 428, 837 N.E.2d 1121. It is likewise clear that a successful plaintiff under chapter 93A should not be able to benefit from poor record-keeping on the part of counsel. Nevertheless, the Court can make a reasonable award based on the submissions and its own observations.

The case was (or at least should have been) a relatively straightforward commercial contract dispute that included a claim for theft of trade secrets.[9] Neither the documents nor the witness testimony were extensive. The number of hours claimed to have been spent by plaintiff's counsel on the case—580.5 hours [10]—is not entirely unreasonable given the motion practice, length of trial, and claimed damages at stake in the litigation. The plaintiff prevailed on the breach of contract portion of its case, and the Court let stand the jury's damages award on that count in the not-insubstantial sum of $267,750.

---

**8.** Plaintiff's counsel's affidavit contains date ranges for tasks, instead of specific dates for each task, and provides only the aggregate time spent during the date range. To cite an example: "From September 1, 2005 to September 30, 2005, I spent time reviewing and summarizing all depositions; I reviewed the Exhibit List; I prepared for argument on the Defendant's Motion to Exclude Expert Testimony; I filed a Motion to Exten[d] Time to File an Opposition; I filed a Trial Brief and Opposition to Defendant's Motion to Exclude; I prepared special questions and jury instructions for the Court; I reviewed the Motion in Limine to exclude speculative proposals for purchases of units. The total amount of time spent was 110.50 hours."

**9.** The case was not without complexities; among other things, they arose from the plaintiff's attempt to rely on unreliable expert testimony as its primary damages evidence, and the parties' confusion as to the proper law to be applied to the dispute (whether Massachusetts or Connecticut, and whether the common law of contracts or the Massachusetts version of the UCC). However, the Court does not believe that these sort of com-

plexities are relevant to the award of attorneys' fees in this case.

**10.** Plaintiff's submission in support of its motion for attorney's fees came in two parts. Its first submission, on January 3, 2006, included a Motion for Attorney's Fees, a memorandum in support, and an affidavit by Stephen G. Morte, plaintiff's counsel. Attorney Morte's affidavit concluded that he "computed the time involved for this action to be no less than 580.5 hours." On January 17, 2005, the Court ordered that plaintiff submit more detailed information of its fees and expenses. On January 26, 2005, plaintiff submitted a supplemental memorandum and a supplemental affidavit by Attorney Morte. His second affidavit concludes that he has "performed no less than 654.50 hours of service in litigating this case." The Court cannot determine why the computations are different; certainly, it is not that Mr. Morte expended 74 additional hours on this case responding to the Court's January 17, 2005 order. The Court will not hazard a guess and need not determine the precise number because it has determined that 580.5 is the more reasonable number.

■ The chapter 93A claim was brought together with a number of other claims. Under such circumstances, an award of fees and costs under chapter 93A should generally include an amount only for those fees and costs that were incurred in connection with the chapter 93A portion of the case. Incase contends that the unfair or deceptive acts that formed the factual basis for its chapter 93A claim also formed the factual basis for its other claims. As a result, Incase contends that it cannot, to any reasonable degree of certainty, excise the amount of time its counsel spent developing the other claims. The Court agrees that the facts underlying the other claims were essentially the same as those underlying the chapter 93A claim. Because the facts substantially, if not completely, overlapped, it would be impossible to apportion the time spent pursuing the chapter 93A claim alone with any degree of precision.

The Supreme Judicial Court has recently acknowledged that, where the chapter 93A claim and accompanying common law claims are largely based on identical facts, it may not be feasible to apportion the attorneys' fees between the two types of claims. *Twin Fires*, 445 Mass., at 430, 837 N.E.2d 1121; *see also Arthur D. Little Int'l, Inc. v. Dooyang Corp.*, 995 F.Supp. 217, 221–22 (D.Mass.1998). The Court will not, in the exercise of its discretion, attempt to cull out the time that plaintiff's counsel spent to develop and prove the non–93A claims.

The Court must, however, deduct an amount that approximates the time spent developing expert testimony, conducting legal research, or drafting of pleadings, or otherwise spent in trial preparation, on items wholly unrelated to proving the chapter 93A portion of the case. This includes, among other things, the time spent on developing jury instructions, developing and arguing motions related to the expert testimony (which concerned only damages and which was never used at trial), and participating in the jury charge conference. *See Wasserman v. Agnastopoulos*, 22 Mass.App.Ct. 672, 682, 497 N.E.2d 19 (1986) (excising a nominal portion to account for the non-chapter 93A aspects of the case).

■ As noted, counsel's submissions do not have sufficient detail to allow the Court to account for such time accurately, and the Court is concerned that plaintiff should not derive a benefit from counsel's poor record-keeping. In the absence of better proof, the Court estimates those tasks to have taken 100 hours, and will deduct an amount from the award accordingly.

The Court finds plaintiff's attorney's hourly rates reasonable—$195 at the commencement of the case and then $245 as of January 2003 and until the present—in light of his experience and geographic location. Plaintiff asks the Court to use an hourly rate higher than plaintiff's counsel normal rate because he took the case on contingency and the belief that the market rate for an attorney of his skill and experience level is higher. The Court declines to do so; no evidence of the amount of awards in similar cases was submitted and the Court has no basis for making such a comparison.

### b. *Costs and Expenses*

■ Defendant argues that plaintiff's expenses on its expert witness should not be recovered. These expenses exceeded $16,000. The witness was retained solely to testify as to damages on the breach of contract and misappropriation of trade secret claims. Defendant argues that these expenses should be excluded because they were not intertwined with plaintiff's effort to prove the chapter 93A claim. The

Court does not agree that expert expenses should be excluded on that basis; the proper measure of actual damages for the 93A claim is the lost profits on the S–4 holders that Timex would have purchased from Incase had it not procured substitutes from Yuhing, plus any costs incurred by Incase in connection with development of the "Universal" design after a certain point in time. Had the expert testified at trial, it may well have been the case that his testimony would have been relevant to chapter 93A damages, and the expenses therefore recoverable. *See Maillet v. ATF–Davidson Co.*, 407 Mass. 185, 194, 552 N.E.2d 95 (1990) ("As far as costs are concerned, reasonable expert witness fees should normally be recovered in a c. 93A case in order to vindicate the policies of the act.") (internal quotation removed).

The Court will exclude the expert expenses, however, for a different reason. Plaintiff did not call the expert to testify, and admits that the expert "provided little, if no value to the case." Furthermore, in its post-trial opposition to defendant's motion for a new trial, plaintiff stated that the expert relied on incorrect facts and that his report was plainly "wrong." Under the circumstances, the Court does not see how it would reasonable to include in its award the costs attributable to this expert.

Finally, although not set forth clearly in the supporting affidavit, Incase has submitted what appears to be a copy of the ledger of expenses associated with this case. While much of the text is not legible, it appears to include the filing fee, costs for deposition transcripts, and expert fees. In the absence of clearer information, the Court will award $1,000 for the filing and service fees, and costs associated with duplication, deposition transcripts, and the like.

Therefore, the Court determines that an attorneys' fee (and costs) award of $115,545 is appropriate in this case.[11] *See Twin Fires*, 445 Mass. at 430, 837 N.E.2d 1121 (fee award of over ten times the actual chapter 93A damages allowed to stand as reasonable).

### Order of Judgment

For the reasons stated in the foregoing memorandum, judgment will enter for plaintiff, Incase, Inc., on Count 6 of the complaint, alleging a violation of Mass. Gen. Laws ch. 93A, § 11. Actual damages would be duplicative with the jury's award on the breach of contract claim; therefore, no additional damages award will enter. Plaintiff is awarded the amount of $115,545 for its reasonable attorneys' fees and costs.

**So Ordered.**

---

11. The Court arrives at this sum as follows: by (1) using data supplied by counsel, dividing 580.5 hours into two groups—those spent before January 1, 2003 (76.75) and those spent on or after that date (503.75); (2) determining the proportionate number of hours each group represents of 580.5 (13.2% and 86.8%, respectively); (3) subtracting from each group the number of hours that represents its pro rata share of 100 hours (13.2 hours and 86.8 hours, respectively, for a remainder of 63.55 and 416.95, respectively); (4) multiplying the remainder by the applicable hourly rate ($195 multiplied by 63.55 and $245 multiplied by 416.95); (5) adding the product of each calculation ($12,392.25 and $102,152.75, respectively) to determine the attorneys' fees to be awarded; and (6) adding $1000 to this amount as costs.